UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 17 CR 512 (KMW)

JOEL TAPIA,

Defendant.

------------------------------x

New York, N.Y.
June 11, 2019
2:30 p.m.

Before:

HON. KIMBA M. WOOD,

District Judge

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY: MARGARET GRAHAM
OLGA ZVEROVICH
Assistant United States Attorneys

CALVIN H. SCHOLAR
SARAH SPEIS
HARA ROBRISH
Attorneys for Defendant

ALSO PRESENT:
Sara Connolly, Paralegal

(Case called)

MS. GRAHAM: Good afternoon, your Honor. Margaret Graham on behalf of the government. Joining me at counsel table is Olga Zverovich and Paralegal Sara Connolly.

THE COURT: Thank you very much.

Good afternoon.

MR. SCHOLAR: Good afternoon, your Honor. Calvin Scholar for Mr. Tapia. With me is Sarah Speis and Hara Robrish.

THE COURT: Very good. Good afternoon.

MR. SCHOLAR: Thank you, Judge.

THE COURT: Good afternoon, Mr. Tapia.

THE DEFENDANT: Good afternoon.

THE COURT: I'm prepared to rule on the motions in limine.

Is there anything that counsel wish to add to the agenda?

MS. GRAHAM: Yes, your Honor, a final allocution of the defendant on the plea offers that have been made and his decision to reject them and go to trial.

THE COURT: Yes. I think we might as well do that right now.

Mr. Tapia, I'm going to ask you to listen carefully to what the prosecutor is saying. She is about to describe the most recent offer of a plea.

THE DEFENDANT: OK.

THE COURT: I'm going to ask you if you did not want to accept it. You don't want to accept it.

THE DEFENDANT: OK.

MS. GRAHAM: Yes, your Honor.

I begin by stating that no formal signed plea offer was ever extended. However, there were discussions with counsel about a plea that we would be willing to extend if Mr. Tapia indicated his willingness to accept it.

So there were kind of three offers. The first was October 2018, which was an offer that he would plead to the lesser-included offense of a (b)(1)(B) drug conspiracy without the 924(c), with an offense level of 32 for the drug quantity, plus an enhancement of two for possession of a gun. With our calculated criminal history category four and the three acceptance points, resulting guidelines would have been 151 to 188 months, with a mandatory minimum of five years and a statutory maximum of life. That was refused.

We then re-extended that April 17, 2018, same offer, same calculations.

After advocacy from defense counsel, we extended a third offer on April 25, which was a (b)(1)(B), still with drug quantity level 32, but leaving the plus two gun enhancement as a carve-out, where the parties could argue about its applicability. So if we had won a Fatico hearing on the gun,

it would have been the same calculations I've set forth. If defense counsel had won a Fatico hearing on the gun enhancement, it would have been the same mandatory minimum of five years, statutory maximum of life, but the offense level would have dropped, and the resulting guidelines would have been 121 to 151 months.

THE COURT: Thank you.

MS. GRAHAM: On April 27, he refused that offer.

All plea offers have expired and are no longer open, and the exposure after trial would be a 15-year mandatory minimum, which would be the (b)(1)(A) drug count plus the five-year mandatory consecutive on the 924(c), with a guidelines of at least 210 to 2062, possibly higher if after trial it was determined that the drug offense level were higher.

THE COURT: Right. Thank you.

Let me begin by asking Mr. -- is it Scholar?

MR. SCHOLAR: Yes, your Honor.

THE COURT: Mr. Scholar, did you discuss each of these plea offers with your client?

MR. SCHOLAR: I did, your Honor.

THE COURT: All right. Did he, in fact, refuse each of them?

MR. SCHOLAR: Yes, your Honor.

THE COURT: All right. With your permission, I'll ask

Mr. Tapia those questions.

MR. SCHOLAR: Thank you, your Honor.

THE COURT: Mr. Tapia, you heard the government describe just now plea offers that have been extended to you?

THE DEFENDANT: Yes, I did.

THE COURT: Is it true that you decided not to accept any of the plea offers?

THE DEFENDANT: Yes. I refuse to accept that.

THE COURT: OK.

THE DEFENDANT: Plea agreement.

THE COURT: Did you do that knowingly and voluntarily?

THE DEFENDANT: Yes, I did.

THE COURT: Thank you.

Is there anything else on the agenda before I move to the motions in limine?

MS. GRAHAM: Your Honor, just in an abundance of caution, that he also discussed the strength of the government's case and the strength of any possible defenses before coming to that determination.

THE COURT: All right.

Mr. Tapia, before you decided not to accept any of these plea offers, did you discuss with your lawyer the strength of the government's case?

THE DEFENDANT: Well, I've discussed with my lawyer the strength that how is it -- I mean, I could be at that such,

you know, high --

THE COURT: Such a high level?

THE DEFENDANT: Right.

THE COURT: When you were discussing all of this with your lawyer, did he tell you the strong points of the government's case, in other words, how strong was the government's case?

THE DEFENDANT: I mean, he didn't tell me how strong the government's case, but I know, you know, it can't -- it's not strong.

THE COURT: All right. But he did tell you it was strong?

THE DEFENDANT: I mean, did he tell me it was strong? I don't understand.

THE COURT: OK. Did he discuss with you the fact that the government had a considerable amount of evidence against you?

THE DEFENDANT: Yes.

THE COURT: OK. Did he discuss with you possible defenses that you would take at trial?

THE DEFENDANT: I guess that's what we're doing now.

THE COURT: Yes.

Well, what we're about to do now is I'm going to rule on the motions about what kind of evidence can come in.

THE DEFENDANT: OK.

THE COURT: But did your lawyer discuss with you how you would defend against these charges?

THE DEFENDANT: Um, yes.

THE COURT: OK. Anything else?

MS. GRAHAM: No, your Honor. Thank you.

THE COURT: All right. Thank you.

MR. SCHOLAR: Your Honor, I did file some submissions today.

THE COURT: I've received them and I've reviewed them.

MR. SCHOLAR: Thank you, Judge.

THE COURT: Thank you.

You have now responded to all of the government's motions in limine?

MR. SCHOLAR: I believe so, Judge.

THE COURT: OK. With respect to the government's motion to preclude evidence regarding the confidential source, I grant the motion without prejudice to defense counsel seeking reconsideration of this ruling if you identify any relevant facts that you could elicit regarding the confidential source. The reason for this ruling is that the investigation's temporary reliance on an incredible source is not relevant. Even if it had some relevance, its probative value would be outweighed by the substantial likelihood of confusing the jury.

Moving to motions regarding the testimony of the government's expert, Inspector Hernandez. The government has

stated that it will call Inspector Hernandez as an expert witness. I will permit his testimony as follows.

With respect to testimony regarding the weight and packaging of the seized drugs, I will permit him to testify that the weight and packaging of the drugs seized here are more consistent with distribution than with personal use.

Defense counsel may not question Inspector Hernandez regarding the confidential source and the CS's impact, if any, on the investigation.

Mr. Hernandez is being tendered as an expert, but not an expert in how to conduct an investigation of a drug trafficking organization.

In addition, because the testimony that you suggest you might like to elicit on this point from Inspector Hernandez would require you to adopt Mr. Hernandez as your own witness, which is something I doubt very much you would want to do.

MR. SCHOLAR: Your Honor, I just have one question.

THE COURT: Yes.

MR. SCHOLAR: With respect to the government's request that he be allowed to discuss the investigation in this case, are you permitting him to discuss the investigation into this case?

THE COURT: As I understand it, the government is not offering evidence from him on that point.

Ms. Graham?

MS. GRAHAM: That's correct, your Honor.

The evidence we are, in fact, offering was set forth in the June 10 letter. In addition to what you mentioned, it includes several other points. I assume you're not holding that we can't call him to discuss those things, such as the price of a kilogram of cocaine, but that you just didn't consider it to be a disputed issue?

THE COURT: Right. I view everything that the government has suggested it wants to offer through Inspector Hernandez as admissible.

With respect to testimony regarding the link between firearms and drug dealing, does the government still seek to --

MS. GRAHAM: No, your Honor.

THE COURT: You're not going to elicit testimony on that?

MS. GRAHAM: No, your Honor.

THE COURT: OK. Thank you.

With respect to the government's motion to preclude evidence of the confidential witness's history of domestic violence, I grant that. However, I note that the government has stated that it intends to introduce evidence of the second altercation and the fact that the defendant denied to the police that there had been an altercation. All of this is without reference to it being a domestic dispute.

With respect to the government's motion to admit

statements made by the drug trafficking organization members to the confidential witness, I grant them. I grant the motion subject to connection. In other words, at a certain point during the trial, I will decide whether the government has established that there is a conspiracy described by the confidential witness.

I believe this covers everything, but if it does not, please let me know.

MS. GRAHAM: You want to go first?

You go first.

MR. SCHOLAR: Judge, one of the filings from this morning, I had asked the court to allow me additional time to respond to the disclosure of June 7, with respect to the government's claim that there was a robbery that took place. As a result of the robbery, there was some comments made to the person named or listed as CW-1.

From reading the letter of June 7, it appeared that they indicated that the untruthful informant, CS-1, was at the heart or had arranged for the robbery. I was wondering how the court was looking at that information and how I could question about the robbery without going into CS-1's untruthfulness.

THE COURT: What is relevant is not who performed the robbery. What is relevant is that it took place, and that as a result of it, Mr. Tapia had firearms at the auto body shop.

Now, I do have a question for the government --

MS. GRAHAM: Yes, your Honor.

THE COURT: -- with respect to that point.

MS. GRAHAM: Yes.

THE COURT: In your May 15 submission on page ten, you say, Tapia told CW-1 that Tapia had a gun for protection as well as a camera system because he sold cars for a lot of money and that if anyone tried to rob him, they would not want to.

Are there two reasons why he had a gun, is that what you're advancing?

MS. GRAHAM: Yes, your Honor. That is exactly right.

I want to be clear about --

Sorry. Would you silence the vibrator on that.

There are several statements about guns. So there is this June 2017 statement that he makes about having a gun at his auto body shop, which he explains to the CW cooperator is to protect his cars.

We would also submit that the cooperator will say that he observed the defendant dealing drugs out of that auto body shop on at least one occasion, and so that we are allowed to argue, it is a permissible inference that he also had the gun there to protect the drugs that he had at the auto body shop.

As you're aware with 924(c), using the gun in furtherance of the drug conspiracy does not have to be the sole purpose of having the gun.

There are then guns that are found at the Cross Bronx

apartment, and those are the guns that Mr. Tapia explained to the cooperator he purchased after the August robbery, which as your Honor noted, it was some individuals that were unknown to the DTO, the drug trafficking organization, the conspiracy, who robbed one of the vans of the conspiracy. And then after that, Mr. Tapia represented to the cooperator that he had purchased the two guns that were found at the Cross Bronx apartment, his parents' apartment, for protection.

Just with respect to the disclosure, because I know that is something that was just brought to your Honor's attention, we had disclosed the fact of that robbery and the CS's participation in that robbery back in, among other things, October 2018, when we disclosed the CS's very lengthy plea allocution where he admitted that he had, in fact, set up this robbery.

What we have only recently disclosed, in an extreme abundance of caution, is statements of four other individuals who were in some way involved in that robbery. None of those individuals will be called at trial. We don't consider it to be Brady relating to the defendant's drug dealing or gun possession. We don't consider it to be Giglio. What they say is largely consistent with what our witness, our cooperator will say about what he observed about the robbery. It was really disclosed in a very extreme abundance of caution.

THE COURT: I understand.

You also disclosed the attorney for each individual?

MS. GRAHAM: That's correct, your Honor.

We, of course, have no objection, once Mr. Tapia has had a chance to read and digest that to him, seek to revisit the issue with the court. We did want to give your Honor further explanation of that.

THE COURT: Thank you. That was in your papers. I understood that.

I would like to make clear that, to the extent that I have ruled on motions, I believe that my rulings are tentative. They should be viewed as operative until I tell you they are not operative, but defense counsel will be allowed to make argument during the course of the trial with respect to these motions.

In other words, if you think my rationale has been eclipsed by some case of evidence, you can bring that to my attention, and I would revisit the decision.

MR. SCHOLAR: Thank you, your Honor.

MS. GRAHAM: Your Honor, I did just want to ask for a little bit of clarification on your prior ruling in your prior order about the wiretap calls that mention Joel and the evidence regarding the gun seized from the Cross Bronx.

That evidence, of course, forms the entire basis of Count Three, the felon in possession is those two guns. So we were wondering, I know you said you wanted more evidence, and

we were wondering what we could provide to get a ruling before we give our opening statement about, you know, Counts Two and Three, because those are obviously the entire evidence in Count Three and very critical evidence in Count Two.

What can we provide to have a ruling one way or the other on their admissibility?

THE COURT: Are the wiretaps that you reference the ones for which you gave us transcripts?

MS. GRAHAM: Yes, your Honor. We specifically attached them.

Defense counsel mentioned certain session numbers, and we attached to those draft transcript to our opposition to his motion in limine. We now have official transcripts, and you can look to the draft transcripts or we can provide to your chambers a chart that shows you which official transcripts those are.

THE COURT: OK. My view is that wiretaps do show the defendant's participation in the DTO and that they are admissible.

With respect to the guns.

MS. GRAHAM: Yes, your Honor. The two guns that were found in the Cross Bronx apartment.

THE COURT: I view that as admissible.

MS. GRAHAM: Thank you, your Honor.

THE COURT: My understanding is, I just want to be

sure on one point, the government contends that Mr. Tapia slept in the bedroom that had a hidden compartment in which the guns were found?

MS. GRAHAM: We contend that he and his girlfriend lived there until about July 2017. The guns were seized August 22, 2017. So that was his bedroom until he moved to an apartment of his own in July.

But he still used that apartment, his parents' apartment, for drug dealing and still had drugs that were found in the closet, and the guns that were found in the closet. We're basing that on the cooperator's testimony and Mr. Tapia's statement to the cooperator after their arrest, the drugs found in the Cross Bronx apartment, the guns found in the Cross Bronx apartment were, in fact, his.

THE COURT: With that representation, I view as admissible the seizure of the guns and their connection to Mr. Tapia.

Would anyone like to raise anything else?

MS. GRAHAM: No, your Honor. Thank you.

MR. SCHOLAR: Judge, would you consider sitting from 9:30 to 2:30?

THE COURT: I think 10:00 to 3:00.

MR. SCHOLAR: 9:30 to 3:00?

I'm sorry. 9:30 to 2:30?

THE COURT: You're asking me to go from 10:00 to 3:00

to 9:30 to 2:30?

MR. SCHOLAR: You already ruled from 10:00 to 3:00?

THE COURT: I'm sorry.

MS. GRAHAM: I thought it was 9:00 to 2:30 based on the individual rules.

THE COURT: I'm sorry for having been confusing on this.

Sometimes I sit from 9:30 until 2:30 and sometimes from 10:00 to 3:00. In this case where there is continuing controversy about my rulings, it seems to me that we should reserve half an hour, that is from 9:30 to 10:00, for any argument and motions.

I do expect, counsel, to raise the day before any issues that are sure to come up the next day. I'll try to resolve them in the afternoon.

MR. SCHOLAR: Thank you, your Honor.

MS. GRAHAM: Yes, your Honor.

The first day when we pick the jury, will we go longer, or still be the 10:00 to 3:00?

THE COURT: I would go longer, if need be.

MS. GRAHAM: If need be to continue picking the jury, but not to put on witness testimony?

THE COURT: Right.

MS. GRAHAM: Thank you.

THE COURT: Is the estimate of the trial's length

still two weeks?

MS. GRAHAM: Your Honor, it's hard to say. Yes, it is certainly no longer than two weeks. We have great hopes that it will be shorter. We currently have 20 witnesses approximately on our list, but the majority of those more than ten are custodial witnesses, and we are actively seeking stipulations as to those witnesses. People like DA chemists, there are six of them that would have to testify about the various testing, T-Mobile custodians, Sprint custodian, things of those nature. We're very hopeful that we can get stipulations to expedite the process.

THE COURT: All right. Anything else?

MS. GRAHAM: Nothing from the government. Thank you.

MR. SCHOLAR: Judge, could I just have one minute?

THE COURT: Yes.

MR. SCHOLAR: Thank you, Judge.

(Defendant conferring with counsel)

Thank you, your Honor. Nothing further.

THE COURT: Thank you very much.

I'll see you Monday.

MS. GRAHAM: Thank you, your Honor.

(Adjourned)