UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 17 Cr. 512 (KMW)

JOEL TAPIA,
a/k/a "Emelio Vasquez,"

Defendant.

Trial
------------------------------x

New York, N.Y.
June 20, 2019
9:50 a.m.

Before:

HON. KIMBA M. WOOD,

District Judge
-and a Jury-

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY: MARGARET S. GRAHAM
OLGA I. ZVEROVICH
Assistant United States Attorneys

CALVIN H. SCHOLAR
HARA A. ROBRISH
Attorneys for Defendant
-and-
DIAZ & MOSKOWITZ, PLLC
BY: SARAH SPEIS

Also Present: Sara Connolly, Paralegal Specialist
Det. Keith Ames, NYPD

Elizabeth Iliakostas
Marcia Gotler
Interpreters (Spanish)

(Trial resumed; jury not present)

THE COURT: What would you like to raise?

MR. SCHOLAR: Thank you, Judge.

Mr. Tapia asked me this morning about the timing of the 801(d)(2) statements that are being testified to by Mr. Rivera, and his concern was that in his view that Mr. Rivera doesn't appear to have entered into a conspiracy with Gabriel until he leaves the rehab in March or April, but he's testifying to statements that predate that.

I've explained to him that under 801(d)(2) and the government's view of the evidence that the conspiracy happened prior to Gabriel and Mr. Rivera exiting the rehab. However, I think for the sake of the record, I don't have -- I have an objection -- withdrawn.

I don't have an objection to Mr. Tapia expressing himself to the Court. I've advised him about my views as to whether he should do that, but I think for the sake of the record, I don't see a problem with him asking that question to the Court.

THE COURT: Thank you. I will do that.

MR. SCHOLAR: Thank you, Judge.

THE COURT: Good morning, Mr. Tapia.

THE DEFENDANT: Good morning.

THE COURT: What would you like to say?

THE DEFENDANT: I was just a little confused because,

you know, being that I've been around my co-defendants in their arguments and what the hell is going on -- excuse my language -- what is going on, I heard -- I heard Mr. Rivera said yesterday that he went with Gabriel to Edward's house and stayed a few blocks away. And I recall them having -- Gabriel and Edward having an argument about that, "How you brung Miguel to my house.

"No, he stayed three blocks away."

So I kind of -- it was a memory that came to me with that, and by him saying it I felt there was something that could, you know, be trying to be connected there. And my attorney, you know, he told me that -- you know, and he's a co-conspirator. So I believe that if it began in August of '16 and he's my co-conspirator, and from August '16 I would understand that he falls under every right. But I believe and I understood that he met Rafael in April, I believe, in a drug rehab program. And after that he states when he met me, he met me further months down.

I just want to make sure that, you know -- it just came to my attention, I was like "wow, but I think I heard that." I heard that testimony. I heard them arguing about that. Like Miguel, "you brought Miguel to my house" amongst them. So when I heard that, I was like it sounds too familiar. And if he came in on this month in May, I believe that happened sooner. I feel like further right now in the time period in

the beginning. And since you told me that you would be, you know, looking in real close and make sure that it would coincide with Miguel's story, I was like it hit me, and I believe I heard that. And that's all I wanted to address to the Court.

THE COURT: I don't think I said what you just recited to me.

THE DEFENDANT: No, no, you said you're looking closely to it.

THE COURT: I look at the law.

THE DEFENDANT: Right. Exactly.

THE COURT: Right. Not the facts.

Would you like to have your lawyer ask any particular questions of Mr. Rivera? Do you have that in mind?

THE DEFENDANT: No, I believe my lawyer is aware of how I feel about it, and if he feels there's a question he needs to ask later on, he'll be able to do that.

THE COURT: OK.

THE DEFENDANT: But I just wanted -- I just want to make sure I know that because -- I just heard something and it triggered me. And since, you know, you said you would look at everything carefully, I thought I was like "Wow, that sounds a little close."

THE COURT: All right. I understand your point, and I will leave it to your lawyer to raise whatever is appropriate

on that subject.

THE DEFENDANT: OK. Thank you.

THE COURT: Is there anything else?

MR. SCHOLAR: No, your Honor. Thank you so much.

MS. GRAHAM: No, your Honor.

THE COURT: All right. We are still lacking three jurors. So feel free to take a ten minute break or so.

Apparently, there's a problem on Metro North that's particularly problematic for Juror No. 4.

(Recess)

THE COURT: My law clerk may have told you that the last juror is on the way up.

MR. SCHOLAR: The live scan -- the realtime does not appear to be working on the screen. I don't know if the Court could have --

THE COURT: We will ask someone to come up to work on that.

(Jury present)

THE COURT: Good morning, ladies and gentlemen.

THE JURY: Good morning.

THE COURT: I wanted to say to you that I see some of you with wraps around your necks, and I should mention to you that there is an architectural design flaw in our courtrooms, which is that the air vents come right down on the jury, so you are colder than the rest of us.

We are ready to proceed.

MS. ZVEROVICH: We are, your Honor. Thank you.

RAFAEL RIVERA, resumed.

DIRECT EXAMINATION

BY MS. ZVEROVICH:

Q. Good morning, Mr. Rivera.

A. Good morning, Madam Prosecutor.

Q. Yesterday when we finished the trial day, we were discussing a theft of a van. Do you remember that?

A. Yes.

Q. Can you just remind the jury what van was stolen?

A. A blue van.

Q. Approximately when was it stolen?

A. In the month of August 2017.

Q. You testified yesterday that you saw the van after it was recovered. Is that right?

A. That is correct.

Q. Please just remind the jury, what did the van look like when you saw it after it was recovered?

A. The van was completely destroyed. It was all broken up inside. The floor had been lifted up. The seats had been removed.

Q. And please remind the jury what had been in the floor of that van?

A. In the floor of that van there was a secret compartment

where the drugs were kept.
Q. All right. Ms. Connolly, if we could -- Mr. Rivera, if you could take a look at -- one second, your Honor.
(Pause)
Q. We will come back to the exhibit I wanted to show in just a second.
Mr. Rivera, after the van was found, did you discuss the theft of the van with anybody in the business?
A. Yes.
Q. Did you discuss the reason why you thought it was stolen?
A. Yes.
Q. And who did you discuss that with?
A. I spoke about it with Gabriel, I spoke about it with Wilson, and I told Joel about it.
Q. What did you discuss -- what did you think the reason the van was stolen?
MR. SCHOLAR: Judge, could we have a time?
THE COURT: Yes.
Q. Mr. Rivera, when was the van recovered?
A. I believe it was a week later.
Q. In August of 2017?
A. Yes.
Q. So you said you discussed that theft with various people. What did you discuss was the reason the van was stolen?
A. I said that they were looking for drugs.

Q. And what, if anything, did Gabriel say?
A. He said yes, that that was true, that they were looking for drugs, and that he no longer wanted that van because people knew about that van and he no longer trusted that van.
Q. So please take a look on your screen when we pull it up at Government Exhibit 20C for identification.
(Video shown)
Q. Mr. Rivera, do you recognize what's shown in Government Exhibit 20C?
A. I'm very sorry, but there is nothing on my screen.
Q. We will try that again.
A. OK.
Q. Let us know if you see anything on your screen.
THE COURT: Is there something on your screen, Mr. Rivera?
THE WITNESS: Now there is.
THE COURT: And the question for you is: Do you recognize what is shown here?
THE WITNESS: Yes, that's the van.
BY MS. ZVEROVICH:
Q. Mr. Rivera, is what you're seeing in Government Exhibit 20C a fair and accurate depiction of the inside of the van as you saw it after it was recovered?
A. Yes.
MS. ZVEROVICH: Your Honor, the government offers

Government Exhibit 20C.

MR. SCHOLAR: No objection, Judge.

THE COURT: Government Exhibit 20C is received without objection.

(Government's Exhibit 20C received in evidence)

Q. Ms. Connolly, let's publish Government Exhibit 20C to the jury.

MS. ZVEROVICH: Your Honor, if you may ask whether the video is working on the jurors' screens.

THE COURT: Can the jurors see the video?

JUROR: Yes. It was up before as well.

THE COURT: Good.

BY MS. ZVEROVICH:

Q. Now, Mr. Rivera, you testified that you also had a conversation about this van theft with Joel. Is that right?

A. Yes.

Q. What, if anything, did Joel say?

A. He said that obviously the people who had stolen the van were going to come back because they were looking for drugs so that we had to be ready for such moment when they came back.

MS. ZVEROVICH: Just one moment.

Q. Now, Mr. Rivera, while you were working for Gabriel, did you hear of any other car theft?

A. No.

Q. Did you hear that anybody's car that you knew was stolen at

some point?

MR. SCHOLAR: Objection, Judge. Asked and answered.

THE COURT: Sustained.

Q. Mr. Rivera, directing your attention to in or about June of 2017, what, if anything, happened to Matthew at that point?

A. I learned that his car had been taken away from him.

Q. And who did you learn that from?

A. Gabriel told me about that.

Q. Did you have any conversations with Matthew himself about that?

A. No.

Q. What, if anything, did Gabriel tell you about what Matthew did when his car was stolen?

A. Gabriel told me that he had been calling several people to go and help him get the car back.

Q. All right. Now, Mr. Rivera, before I conclude with my last two topics that I wanted to ask you about, I have a few follow-up questions from yesterday.

A. OK.

Q. Now, you testified yesterday that you were delivering drugs for Gabriel, and that you were collecting money from customers. Is that right?

A. That is correct.

Q. Now, generally speaking, did Gabriel make money off of his drugs?

A. Yes.
Q. How much profit did Gabriel generally make off of heroin?
A. It could be a lot. It depended on the customer that he was selling to.
Q. And the same with cocaine?
A. Yes, that is correct.
Q. Now, did Gabriel make a profit off of everybody he sold to or did he sometimes sell without making a profit?
A. He made money off of everyone except Joel. He didn't charge Joel extra.
Q. And how do you know that?
A. Because he told me.
Q. What did Gabriel tell you?
A. He told me that he gave it to Joel for the same price that he bought it for.
Q. When you say he gave "it" to Joel, what did he give to Joel at the same price?
A. The cocaine or heroin that he bought or that he ordered.
Q. What was the price that Gabriel generally bought cocaine for?
A. The price depended. It could be 29, 28, 30. The price varied.
Q. When you say 28, 29, 30, is that dollars per gram?
A. That is correct.
Q. And that's for cocaine, right?

A. That is correct.
Q. And what about for heroin. How much did Gabriel usually pay for his heroin?
A. He could pay perhaps $49 or $50 per gram.
Q. Now, yesterday you testified about a customer named El Indio. Do you recall that?
A. Yes.
Q. And you testified that you delivered cocaine and heroin to El Indio?
A. That is correct.
Q. How much cocaine did you deliver to El Indio?
A. Every week or week and a half I would deliver 50 grams of cocaine to him.
Q. And what about heroin, how much heroin?
A. The same thing.
Q. You also testified yesterday that El Indio used to be Joel's client. Is that right?
MR. SCHOLAR: Objection, Judge. Asked and answered.
THE COURT: Overruled.
A. That is correct.
Q. And when was El Indio Joel's client?
A. Gabriel had told me that it was whenever he was detained or in prison.
Q. And was that -- so you had testified that Gabriel was in a drug treatment program with you.

A. That is correct.
Q. Was Joel -- was El Indio Joel's client at that time or was it prior to that?
A. I can't say for sure. But when Gabriel told me that he had gone to see that person, he told me that the person had been purchasing from Joel beforehand.
Q. Do you know approximately when Gabriel was in jail?
A. Not exactly.
Q. What, if anything, did Gabriel tell you about what happened to the business while he was in jail?
A. He told me that at the beginning Edward and Mateo would work directly with him. And that when he went to jail, Edward and Mateo had kept all the telephone numbers; they had kept the suppliers; they had taken over everything.
Q. And did Gabriel tell you what happened when he got out of jail?
A. He told me that he started working for them, for Edward.
Q. All right. Now, you also testified yesterday that in about June, Kiki and Gabriel had a dispute. Do you remember that?
THE INTERPRETER: I'm sorry, counselor, who?
Q. Kiki and Gabriel had a dispute.
A. Yes. They were sort of like angry at each other.
Q. And you also testified that at that point some of Kiki's customers switched to Joel. Is that right?
A. That is correct.

Q. And one of the customers you testified about was somebody named Oh, do you remember that?
A. Yes, that's what we called him.
Q. And what did Oh buy?
A. While I was there with Kiki, he used to buy crack.
Q. And how much crack did Oh buy?
A. He would buy one gram, two grams, half a gram.
Q. And approximately how often?
A. Every day, every maybe like four, five hours.
Q. And approximately when did Oh switch from Kiki to Joel?
A. Approximately when Gabriel was angry or annoyed at Kiki.
Q. And about when was that?
A. That was like in June.
Q. And then also you testified yesterday about some customers on Powell. Do you remember that?
A. That is correct.
Q. Which customers from Powell switched from Kiki to Joel?
A. Two women that lived on Powell.
Q. Do you know their names?
A. No.
Q. And let's just take them one by one. What did one of the women buy?
A. One of them bought cocaine, and the other one bought heroin.
Q. And the one that bought cocaine, was that powder or crack

cocaine?
A. Powder.
Q. And how much powder cocaine did that customer buy?
A. It depends. Maybe at the beginning of the month she would buy two or three grams. It never went above five grams, but she used to call in practically every day.
Q. Meaning, she used to buy every day?
A. Yes.
Q. And what about the other woman who bought heroin, how much heroin did she buy?
A. She would buy one gram, two grams, three grams, half a gram. She bought every day as well.
Q. And approximately when did these customers switch to Joel? Was that approximately the same time in June?
A. Yes.
Q. Now, besides the customers we discussed, do you know of any other customers that Joel had?
A. He had one in the same building where he lived. I think there was a man with a blue van who also used to buy from him.
Q. Now, how do you know that Joel had a customer in the same building where he lived?
A. Gabriel told me.
Q. And did Gabriel tell you what that customer bought?
A. He told me that it was heroin.
Q. Did Gabriel tell you how much?

A. No.
Q. And what about the man with the blue van, how do you know that that was Joel's customer?
A. Because Gabriel brought him to me, and he said, "He used to buy from Joel, but it seems like now Joel doesn't want to sell to him any more. So whenever he calls you, sell to him."
Q. And did you start selling to that man?
A. I sold to him like on three occasions.
Q. And what did he buy from you and how much?
A. He would buy grams of cocaine.
Q. Approximately how much?
A. Three to five grams.
Q. And that's powder cocaine?
A. Yes.
Q. Now, please take a look at Government Exhibit 18B for identification on your screen.
Do you recognize what is shown in those photographs?
A. Yes, that's the entrance to Joel's shop.
Q. And did you take these photographs?
A. No.
Q. Do they fairly and accurately depict the entrance to Joel's shop as you remember it?
A. Yes.
MS. ZVEROVICH: The government offers Government Exhibit 18B.

MR. SCHOLAR: No objection, Judge.

THE COURT: Government Exhibit 18B is received without objection.

(Government's Exhibit 18B received in evidence)

Q. Ms. Connolly, let's publish 18B to the jury.

Now, Mr. Rivera, these are better than what we had yesterday. What are we looking for in the first picture?

A. We are seeing the entrance to the shop in that photo.

Q. So how do you get to the shop from what we're looking at here?

A. That's the front part on the road outside.

Q. So is the shop if you keep walking down the alleyway?

A. That's correct. You would walk through the alleyway, and then when you get to the back, the shop is on the right.

Q. Let's look at the next picture.

What are we looking at in this picture?

A. The shop where the tools are is inside of those two doors.

Q. Now, Mr. Rivera, yesterday you testified that Kiki was living in the basement apartment in the same building. Do you remember that?

A. That is correct.

Q. And you testified that at some point Kiki moved out, right?

A. That is correct.

Q. What, if anything, did Gabriel explain to you about why Kiki moved out?

A. Gabriel said to me that the reason was that Joel was upset with Kiki because Kiki was waiting on some customers on the street out front who Joel had previously been taking care of.
Q. What kind of customers?
MR. SCHOLAR: Judge, could we just have a time?
THE COURT: Yes.
Q. Well, approximately when did Kiki move out of that apartment?
A. I believe it was July. I'm not sure.
Q. So what kinds of customers were you just talking about?
A. Some people who were buying crack.
Q. Now, during the time that you worked for Gabriel, did you keep the same phone number or did you change phone numbers?
A. No, I would change them.
Q. And approximately how many times would you change a phone number?
A. About four times.
Q. Why did you change your phone number?
A. We would always change them to prevent our phones from getting tapped.
Q. Do you mean wiretapped by the police?
MS. GRAHAM: Objection, Judge. Leading.
THE COURT: Sustained. You can elicit it a different way.
MS. ZVEROVICH: Sure.

Q. What do you mean by "our phones being tapped"?
A. To make sure that the police were not listening to our conversations.
Q. Now, you just said that "we" changed our phone numbers. Who changed their phone numbers?
A. I would go along with Gabriel, and he would change his numbers, he and I.
Q. And how often would Gabriel change his phone numbers?
A. During the time I was in the organization, maybe four or five times. I could not tell you exactly.
Q. Do you know if anybody else also changed their number?
A. I couldn't tell you that because I didn't have those numbers. I did not take anyone else's numbers except for my customers.
Q. Mr. Rivera, do you know somebody named Adolfo?
A. I've heard that person's name mentioned.
Q. From whom?
A. By Gabriel.
Q. What did Gabriel tell you about Adolfo?
A. Well, one day we were working. Wilson was also there. We were talking, and it was mentioned that Adolfo was Edward's supplier.
Q. Who said that?
A. Gabriel.
Q. Did Gabriel say anything else about Adolfo?

A. Yes, he said that he had a lot of money, and that he was very dangerous.
Q. What drugs, if you know, did Adolfo sell?
A. From what I understand, he would bring cocaine to Edward, and I also heard that he would bring drugs to Johnnie, and he would bring him heroin.
Q. Now, you testified yesterday that you saw Gabriel and others cooking crack while you were working for Gabriel. Is that right?
A. That is correct.
Q. What is the smallest amount of crack of you've ever seen being cooked?
A. 100 grams.
Q. Are you familiar with the word "*manito*"?
A. That is something that you use to put in heroin to make it go further.
Q. And while you were working for Gabriel, did you see mannitol being used?
A. Yes.
Q. Who used mannitol?
A. Well, when we were preparing drugs for different people and I was at the table, we would use it in heroin.

MR. SCHOLAR: Could we have a clarification as to the "we," Judge?

THE COURT: Yes. Could you please clarify who you

meant by the word "we."

THE WITNESS: Usually Gabriel was at the table, and Moises was there, and I was present.

Q. Now, you testified that you saw crack being cooked. Had you ever seen or heard of heroin being cooked?

A. One time when I was with Gabriel, he cooked about five grams of heroin.

Q. Can you tell us -- tell us about that time.

A. He weighed the five grams. Then he added a little bit of water, put them into a pan on the stove, and then he heated the stove; and after it was melted, he put it into the freezer.

Q. And did you see how that came out?

A. Yes.

Q. How did it come out?

A. It was like sticky.

Q. Was it good heroin or no?

A. No.

Q. All right. Now, you also testified yesterday that Gabriel told you that Joel bought pure heroin uncut with anything. Do you remember that?

A. That is correct.

Q. Did you have any conversations with Gabriel about what, if anything, Joel did with the pure heroin he bought?

A. We talked, and he told me he gave it to Joel, and he said that Joel prepared it differently for the people that he had,

his customers.
Q. Did Gabriel explain how Joel prepared it differently?
A. Yes. He told me that he put in more cut, more than we put in.
Q. Mr. Rivera, are you familiar with the term *colleccion* or *collectacion*?
A. Gabriel used to use that term when he was picking up money.
Q. Picking up money for what?
A. Whenever he would call the people who owed him money from the drugs that I had brought them before, whenever he thought that they had finished up with them, he would call them so he could get the money and then deliver more drugs to them.
Q. Now, I just want to go back to something you just said. So, you just said that Gabriel told you that Joel added more cut to heroin. Is that right?
A. That is correct.
Q. Did Gabriel tell you how much cut Joel added?
A. No, but he told me that it was more cut than what we were putting in.
Q. And how much cut did Gabriel typically put into heroin?
A. Typically, if it were one kilo of heroin, he would remove 200 or 300 grams depending on the quality of the heroin and then add in the cut.
Q. Now, I want to switch gears and talk about your arrest in this case.

When were you arrested?
A. August 21, 2017.
Q. Where were you when you were arrested?
A. Well, I was inside in one of the vans that I drove.
Q. What kind of van?
A. A Honda Odyssey.
Q. And what, if anything, did you have in the car at the time of your arrest?
A. Well, I had my notebooks with my notes in them, I had money, and I had drugs in the car.
Q. What drugs did you have in the car?
A. I had heroin, and I believe I had crack.
Q. Where had you gotten those drugs from?
A. Gabriel had given me those drugs the previous day.
Q. What were you doing with them on that day?
A. Well, I had just left the house that day and I was going to head over to where my children's mother lived, but I had to wait for this person to call me because I was supposed to deliver the heroin to them.
Q. And where in the car were the drugs?
A. Well, it's where you put your hands in between the metal part of the door and the leather part like where you would -- you would put your hand in order to either open or close the door.
Q. And did the agents who arrested you find those drugs?

A. Yes, that's correct.
Q. Take a look at Government Exhibit 16 for identification.
Mr. Rivera, do you recognize what's shown in the photographs?
A. Yes, that's the van that I was driving.
Q. And did you take the photographs?
A. No.
Q. Do these photographs fairly and accurately capture the way that your car and its contents looked like on the day of your arrest?
A. That is correct.

(Continued on next page)

MS. ZVEROVICH: Your Honor, the government offers Government Exhibit 16.

MR. SCHOLAR: No objection, Judge.

THE COURT: Government Exhibit 16 is received without objection.

(Government Exhibit 16 received in evidence)

MS. ZVEROVICH: Ms. Connolly, let's publish page 1 of Government Exhibit 16.

Q. What is this, Mr. Rivera?
A. That is the van that I was driving.

MS. ZVEROVICH: Let's publish page 3.

Q. What are we looking at in this picture?
A. That's the place where I was storing, or hiding, the drugs.
Q. And what part of the car is this?
A. That's the door, the cover to the door.

MS. ZVEROVICH: Let's publish page 6.

Q. What are we looking at in this picture?
A. Money.
Q. And where was the money?
A. In the glove compartment of the van.
Q. And where had you gotten this money from?
A. From the sale of drugs.

MS. ZVEROVICH: And let's publish page 8.

Q. What does this picture show?
A. That's the notebook where I would write down my notes.

Q. And is that one of the notebooks we discussed yesterday?
A. That's correct.
MS. ZVEROVICH: All right. We can take that down, Ms. Connolly.
Q. Now, Mr. Rivera, did you also have drugs in your apartment, where you lived?
A. Yes.
Q. Did law enforcement search your apartment?
A. No.
Q. And what, if anything, did you do with the drugs in your apartment after you were arrested?
A. I told the mother of my daughter to look up a person I had on Facebook, and I told her to send him a message -- send him the phone number via a Facebook message.
THE INTERPRETER: Interpreter's correction: No. I asked her to ask him to send his telephone number via Facebook message.
Q. And what happened?
A. I then told her that she should call him after she got the number -- after he sent her the number, and tell him that I was in jail and tell him to go to my apartment -- he already knew where I lived -- and to go and get my things from there; and that he should help her with my things, because some of them were heavy. And I told her to tell him that inside of the closet I had some sneakers that were on the top part of the

closet in a black bag, and I told her to let him take the sneakers that were in the bag with him.
Q. And did your -- did that person pick up the drugs that were in the apartment?
A. Yes. That person did go and pick up what I had said were sneakers inside of the bag, which were drugs.
Q. And do you know what happened to those drugs?
A. He took them, but I tried to call him and I was not able to speak with him.
Q. Did you get any of those drugs or any money for it?
A. No.
Q. Now, did you arrange for this pickup before or after you began cooperating with the government?
A. Before.
Q. And did you disclose this to the government after you began to cooperate?
A. Yes.
Q. Now, after your arrest, were you put in jail?
A. Yes.
Q. Which jail?
A. MCC.
Q. Is that here in Manhattan?
A. Yes.
Q. And were any of your codefendants in that same jail?
A. We were all in the same jail, different floors but in the

same jail.
Q. And were you present for conversations among your codefendants after your arrest?
A. Yes.
Q. And were most of those conversations before or after you began cooperating with the government?
A. I had some before and after.
Q. And just generally, why were your codefendants discussing the case?
A. Well, first off, we were what people say, putting the jigsaw pieces together, trying to figure out who it was in the organization who had talked. And after that we were thinking about how it was that the police came after us and the subject of how fast it all happened or how soon it all happened after the robbery of the van came up, and we thought that that was the way that they had gotten to us, through the robbery of the van. And then we were discussing how the government hardly had any real evidence against us.
Q. And who was participating in these conversations?
A. Well, first, I was talking with the people who were together on the same floor with me.
Q. Who was that?
A. Well, Gabriel Guillen, Edward, Wilson and Gabriel Carrion were on the same floor as I was.
Q. And did any other people participate in discussions about

the case?
A. Yes, but at that time we were just -- well, we still had not been able to all get together.
Q. Now, at any point did your codefendants discuss what was found during searches on the day of the arrest?
A. Yes.
Q. And was Wilson involved in those discussions?
A. Yes. Yes, I was asking Wilson who the gun that was found belonged to, because I had never known about any guns and I had never seen any.
Q. And when you say the gun that was found, where was that gun found?
A. That gun was found at the apartment on the Cross Bronx.
Q. And what did Wilson say?
A. Wilson told me that that gun did not belong to him; that he said that it was his and he owned up to it because at that moment his parents were handcuffed and he didn't want his parents to be taken away, so he agreed to say that it was his.
Q. And did he say whether or not it was really his?
A. Yes. He told me it wasn't his. He told me that gun was really Joel's.
Q. And what, if anything, did Wilson say about the drugs that were found in that apartment?
A. He told me that when the police came, the police asked him the question, Do you have any drugs or guns here in the

apartment? And he knew that there were drugs in the closet for some crack that he had cooked the day before, which he had in the closet drying up. So he told the police yes, there are drugs there; in the closet, there's crack.
Q. And where was this conversation?
A. First, I had that conversation with Wilson on the floor. And then after that, there was a time when we had a court appearance and we were all there and we all were talking about it, and we were talking about it in the pens.
Q. All right. Now, the conversation -- we'll get to that in just one second.
The conversation with Wilson, who else, if anybody, was present for that?
A. Gabriel was there.
Q. And did Gabriel say anything?
A. Gabriel said that he, too, didn't know anything about the gun.
Q. Now, you said the conversation came up again when you were waiting for court?
A. That is correct.
Q. Where was that?
A. In the pens. I don't know what floor it is. It's when they bring you -- it's over there at the MCC, when they bring you over to court.
Q. And who were there?

A. All of us. Every single one of us was there, except -- except Kiki, who was in Brooklyn, and Zoraida, who was alone in a different pen.

Q. And what was the conversation in the bullpen?

A. We were asking who did these guns belong to, because they had found another gun. He said -- Wilson said that the guns belonged to Joel, and Joel agreed that they were his. And Joel said that on the day when they came to arrest him, that they had cameras, and that he went downstairs and that he turned himself in because he knew he also had a silencer.

Q. That's Joel?

A. Yes.

Q. Now, when you say Joel agreed that the guns were his, did Joel explain why he had those guns?

A. He said that the reason he had bought those guns is because he felt that they -- they all needed to be ready, because the people who had stolen the van knew that we were working with drugs and they were going to come back again to rob us.

Q. And which guns did Joel say were his?

A. The ones that were in the apartment on the Cross Bronx.

Q. All right. Now, you also said that Joel said that on the day of the arrests, he went to meet the agents. Is that right?

A. Yes.

Q. Did Joel explain how he know to go out to meet the agents?

A. He said that he saw on the cameras that they were outside,

and that's why he went downstairs.
Q. And why did he say he did that?
A. Because in the apartment he had a silencer.
Q. Are you familiar with what a silencer is?
A. Well, I've never had one, but it refers to something that you attach to a weapon so that it makes no noise when it's fired.
Q. Did Joel say whether or not he had a gun in the apartment that went with the silencer?
A. No.
Q. Now, these two conversations that you described with Wilson and then this one in the bullpens, were those before or after you began cooperating with the government?
A. Before.
Q. Now, at one point did your codefendants discuss any drugs that were found or missed by the agents in the searches?
A. Yes. He told me that he called up his mother and that his mother said to him that they finally had hot water in the apartment, because when the agents were there, they broke up the bathroom, everything there. And he asked his mom, Did they break open the wall in the bathroom? Because the part where the bathtub is, that wall, they had broken into that. And his mother told him no, the other part was not touched.
And he told me that they got lucky, that eight kilos that they had inside the wall were not found.

Q. Who told you this?
A. Gabriel.
Q. And did he say eight kilos of what was not found?
A. He told me it was heroin.
Q. And what, if anything, did Gabriel discuss about how to get those eight kilos from the apartment?
A. At that moment he didn't say anything to me, but he started speaking, talking to the other codefendants, who were on floors above us, through the vents.
Q. Who were Gabriel speaking to?
A. He spoke to Joel, with Mateo. And the other codefendants were on the floor above that.
Q. And did you hear those conversations?
A. No.
Q. Did Gabriel discuss what he had discussed over the vent with you?
A. He told me that he spoke to Joel about how -- the way in which they were going to retrieve those kilos out of there.
Q. And what did Gabriel tell you about those conversations?
A. He said that we were all going to meet in church on Saturday and that we were going to have that conversation in church on Saturday.
Q. And what happened?
A. Yes, we went down to church and we had the conversation. Gabriel said that Joel had said that he was going to ask Betty

to go there with her brother and retrieve the kilos that were there.
Q. And what did Gabriel think about that plan?
A. Well, Gabriel wasn't too much in agreement, but he had no other option.
Q. And did you find out from Gabriel what happened to the eight kilos?
A. He said they were taken away.
Q. By whom?
A. I think he said it was Betty's brother.
Q. Now, Mr. Rivera, was this discussion before or after you began cooperating with the government?
A. I think I had already met with the government.
Q. Now, while you were at the MCC with your codefendants, did you ever smoke in prison?
A. Yes, I smoked and I've used drugs while I was at the MCC.
Q. What did you smoke?
A. I was smoking K2.
Q. And what drugs did you use?
A. I used a drug called *chinita*. I used pills.
Q. And how many times did you do that?
A. On several occasions.
Q. How many?
A. About three times.
Q. And why did you do that?

A. I had an addiction when I was out on the street, and I couldn't sleep so I needed something to sleep. The other times I was with my codefendants and they had said to me, Come, let's smoke, and I had already gone to see the government, so I felt between, in the middle -- I felt like I was in the middle.

Q. And when you say you were in the middle, what do you mean by that?

A. I had already started talking to the government, and I didn't want them to realize that I was talking to the government.

Q. And after the couple times, the few times that you did that, did you smoke again in prison?

A. I think I smoked one more time, and that was it.

Q. All right. Now, Mr. Rivera, are you familiar with the term "discovery"?

A. Yes.

Q. Please explain to the jury, what is discovery?

A. That's the things that were seized from you, the telephone calls.

Q. The government's evidence in the case?

THE COURT: You were asked to repeat the question, not just part of it. Repeat the question.

BY MS. ZVEROVICH:

Q. So, discovery is basically the government's evidence in the case?

A. Yes.
Q. Now, after you were arrested, did you receive discovery from the government?
A. I didn't get any, but people who were with me did get discovery.
Q. And did your codefendants discuss the type, what types of evidence was in the discovery?
A. Yeah, they talked about a couple of things, phone calls.
Q. Did your codefendants ever show you any of the discovery?
A. Yes, they showed me photographs, and I listened to telephone calls.
Q. And apart from seeing the photos they showed you and listening to the two telephone calls, did you see any of the discovery in this case?

MR. SCHOLAR: Objection, Judge. Mischaracterizes what the witness said. He never puts a number on it.

THE COURT: Correct. I sustain.

BY MS. ZVEROVICH:
Q. Apart from the photos that you saw and the two telephone calls that you listened to --

MS. ZVEROVICH: Oh.

Q. How many --

MS. ZVEROVICH: I'm sorry, your Honor.

Q. How many telephone calls did you listen to while you were in jail?

A. I listened to a few.
Q. How many, approximately?
A. I would say about five or six calls, but I'm not sure.
Q. And so, apart from listening to those five or six calls and viewing photos, did you review any other discovery in this case?
A. I saw photographs where there were drugs, there was money. We discussed phone calls.
Q. Anything else?
MS. ZVEROVICH: Withdrawn.
Q. And apart from listening -- you testified yesterday that you had done some voice attributions?
A. Yes, that is correct.
Q. Apart from playing a few clips from telephone calls for you for purposes of voice identification, did the government show you any discovery in this case?
A. No.
Q. Right. Now I'd like to conclude by asking you about one more topic, and that's about your cooperation agreement in this case.
A. OK.
Q. Now, after you were arrested, you testified that you decided to cooperate with the government. Is that right?
A. That is correct.
Q. Why did you decide to cooperate with the government?

A. I decided to cooperate with the government because I had been arrested many other times, and with my record, I knew that I would be facing a lot of time in jail.
Q. And what did you do to cooperate?
A. I approached my attorney and I told him that I wanted to talk to the government.
Q. And did you meet with the government --
A. Yes.
Q. How many times?
A. Several times.
Q. And did you provide information to the government during those meetings?
A. Yes.
Q. What types of information?
A. I told them the role of the different people in the drug organization in which I was involved.
Q. And what else?
A. I told them who the bosses were.
Q. And what did you tell them about yourself?
A. I told them everything that I did from the moment that I started working with those people in drugs.
Q. And did you tell the government about the different crimes you've committed in your life?
A. That is correct.
Q. And did there come a time when you pleaded guilty to the

charges against you?
A. That is correct.
Q. And please remind the jury, what crimes did you plead guilty to?
A. I pled guilty to a drug conspiracy. I pled guilty to firearms. And I pled guilty to fraudulent credit cards.
Q. And the fraudulent credit cards, were those the cards that were found in your car in December of 2016 that you testified about?
A. That is correct.
Q. And have you been sentenced yet?
A. No.
Q. What is your understanding of the maximum sentence that you face as a result of your guilty plea?
A. Life.
Q. And what is your understanding of the minimum sentence that you face as a result of your guilty plea?
A. 35 years.
Q. What is the minimum sentence on your drug charge?
A. 10 years.
Q. And what about on your gun charge?
A. 25 years.
Q. And why is the minimum sentence on your gun charge 25 years?
A. Because it's the second time that I'm in a federal court

for the same case.
Q. And in connection with your plea, did you enter into a cooperation agreement with the government?
A. Yes.
Q. Please take a look at Government Exhibit 900 in the small binder in front of you.
A. What number?
Q. 900.
A. In this one?
It's not in this one, but I could see it on the screen.
Q. All right. Take a look at it on the screen.
Do you recognize this document?
A. Yes.
Q. What is it?
A. Yes, that's the cooperation agreement that I did with the government.
Q. And looking at the last page of that, did you sign that agreement?
A. That is correct.
Q. And did the government sign the agreement?
A. Yes.
MS. ZVEROVICH: Your Honor, the government offers Government Exhibit 900.
MR. SCHOLAR: No objection, Judge.
THE COURT: Government Exhibit 900 is received without

objection.

(Government Exhibit 900 received in evidence)

BY MS. ZVEROVICH:

Q. Now, Mr. Rivera, I just want to clarify. So, you had testified that your minimum sentence on your gun charge was 25 years?

A. That's correct.

Q. And you said that that was because this is the second time in federal court for the same case. Can you explain what you mean?

A. It's not the same case, but it is the same charge, which is possession and carrying of a firearm in an organization that deals drugs.

Q. Now, the document in Government Exhibit 900, the cooperation agreement, is that the entire agreement, your entire agreement with the government?

A. That is correct.

Q. Has the government or anybody else made you any promises apart from those in the cooperation agreement?

A. No.

Q. What is your understanding of your obligation under the cooperation agreement?

A. To be willing and able to, every time the government asks me to, cooperate with them and to come and testify if I'm needed; to tell them about all my crimes and never again commit

any other crimes.
Q. And what else?
A. And to always tell the truth.
Q. And what is your understanding of what the government will do if you comply with those obligations?
A. I did not understand.
Q. What will the government do if you comply with your obligations under the cooperation agreement?
A. The government will write a letter to her Honor, the judge, which is called a 5K letter, telling -- saying everything that I did in my case.
Q. And what is your understanding of what type, types of information goes into a 5K letter?
A. Have I helped the government in the case that I have?
Q. And what types of information about you goes in the letter?
A. In that letter contained also are all the crimes I ever committed.
Q. And who receives the letter?
A. The honorable judge.
Q. And what is your understanding of what a 5K letter allows the judge to do?
A. She can decide whether I get 35 years or whether I get life. She decides the time that I'm going to spend in prison.
Q. And with a 5K letter, is the judge still obligated to give you at least 35 years?

A. Not if she doesn't decide to do that.
Q. So, with the 5K letter, what is your understanding of the lowest possible sentence that you can get?
A. I can even get time served.
Q. Now, does a 5K letter require the judge to give you a reduced sentence?
A. No.
Q. Even with the letter, what is the maximum sentence that you can get?
A. I can get as much as life.
Q. And who will decide your sentence?
A. Her Honor, the judge.
Q. Anybody else?
A. No.
Q. Now, will the government make any recommendations about what sentence you should get in the 5K letter?
A. No.
Q. And sitting here today, do you know what sentence you'll get?
A. No.
Q. Has anybody promised you any sentence or any range of sentences?
A. No.
Q. And is it fair to say that you're testifying hoping to get a reduced sentence?

A. That is correct.
Q. What sentence are you hoping to get?
A. I would love to get time served.
Q. And what is your understanding of what would happen if you didn't tell the truth in court?
A. The agreement with the government is ripped up.
Q. And what is your understanding of what effect that will have if the agreement were ripped up?
A. I could spend the rest of my life in prison.
Q. Now, what is your understanding of whether the jury's verdict in this case has any effect on your sentence?
A. None.
Q. And does it have any effect on whether you get a 5K letter?
A. No.

MS. ZVEROVICH: One moment.

No further questions.

THE COURT: OK. Everyone should feel free to stand and stretch. We'll be breaking for lunch in 35 minutes. Does anyone need a break before then?

OK. We'll take a ten-minute break. The jury is free to go to the jury room.

(Jury not present)

THE COURT: Please have a seat.

Mr. Rivera, you're free to take a break.

(Witness not present)

THE COURT: And of course, the same is true for everyone else in the courtroom.

MS. ZVEROVICH: Thank you.

MS. GRAHAM: Thank you, your Honor.

(Recess)

(Jury present)

THE COURT: Please have a seat.

Mr. Scholar.

MR. SCHOLAR: Thank you, Judge.

CROSS-EXAMINATION

BY MR. SCHOLAR:

Q. Good afternoon.

A. Good afternoon.

Q. Rafael, Rafi, Los, Mr. Rivera, what would you like me to call you?

A. Whatever is most comfortable for you.

Q. So, Mr. Rivera, when you testified about time served, that means you would be released, correct?

A. Yes.

Q. That means you get out of jail, right?

A. Yes.

Q. And that's what you want, right?

A. Yes.

Q. Now, you've met with the government many times, right?

A. That's correct.

Q. And you understand what I mean by the government -- the prosecutors and the law enforcement?
A. That's correct.
Q. And you've met here in the courthouse?
A. Yes.
Q. And you've met at their offices?
A. Yes.
Q. About how many times?
A. Quite a few.
Q. You've been meeting since December of 2017, correct?
A. Yes.
Q. So, about 20 times?
A. It might be, or more.
Q. In getting ready for your testimony here, did you meet with them more often?
A. Yes.
Q. How often did you meet with them in getting ready for your testimony?
A. This last week before the trial, I saw them three times, if I'm not mistaken.
Q. And when you leave court after the day of testifying, do you meet with them as well?
A. No.
Q. Now, in preparing for your testimony, the government went over their questions that they asked you here, correct?

A. They asked me questions.
Q. And you practiced your testimony that you gave here today, correct?
A. I didn't practice it, no. I answered what they were asking me with the truth.
Q. And they did not go over the questions that they would ask you here at trial?
A. Yes.
Q. That's practice, right?

THE COURT: Your question is, I think, a double negative. Can you clear it up.

MR. SCHOLAR: I said, That is practice, right?

THE COURT: Well, the question, "They did not go over the questions that they would ask you here at trial," the answer is yes, that they did not, I take it.

MR. SCHOLAR: I see what your point is, Judge.

THE COURT: OK.

BY MR. SCHOLAR:
Q. So, they went over the questions that they would ask you at trial, correct?
A. Yes, they asked me those, and they asked me other questions in addition.
Q. The other questions, the prosecutor asked you questions in a practice cross-examination, right?
A. I was asked those kinds of questions too.

Q. Now, on Tuesday, the prosecutor asked you about your life in Puerto Rico. Do you remember that?
A. Yes.
Q. And you said that you started out by stealing cars?
A. Yes.
Q. And you said that you took a car from a person when you were about 18?
A. Yes.
Q. And you testified that you took the keys from the person?
A. Yes.
Q. How did you get the keys?
A. I was out with several people, and we had a firearm.
Q. So, you showed the firearm to the guy and he gave you the keys?
A. That's correct.
Q. You also said you took away his money, correct?
A. That's correct.
Q. And who had the firearm?
A. There were two people who had a firearm.
Q. And you were with them, correct?
A. Yes, I was with them.
Q. And you knew they had a firearm, correct?
A. Yes.
THE COURT: You have to pause briefly after the answer. What was the question? You knew they had a firearm?

MR. SCHOLAR: You knew they had a firearm, correct?
THE COURT: More than one.
THE WITNESS: Yes.
BY MR. SCHOLAR:
Q. Was there one firearm or more than one?
A. There were two firearms.
Q. Now, ultimately, you pled guilty to stealing those cars?
A. That is correct.
Q. And you stole other cars besides the one we just talked about, right?
A. That is correct.
Q. And did you use a firearm to steal those cars as well?
A. No.
Q. When you pleaded guilty to stealing those cars, what sentence did you receive?
A. I was given probation.
Q. And were you still under probation when you left Puerto Rico and came to mainland United States?
A. Yes.
Q. So, you fled Puerto Rico?
A. No.
Q. You continued to report to your probation officer in Puerto Rico?
A. Yes.
Q. Now, the prosecutor also asked you on Tuesday about a

robbery in 2001 of a cockfighting club?
A. That is correct.
Q. And you had a gun during that robbery, right?
A. That is correct.
Q. And other people with you had guns, right?
A. That's correct.
Q. Why did you bring guns to that robbery?
A. We were going to steal money, and there were a lot of people.
Q. And what were the guns for?
A. The guns were to control the people and scare them.
Q. And shoot them, if necessary?
A. That had not been planned.
Q. Let me ask this. Were the guns loaded?
A. Yes, they had bullets in them.
Q. Why would the guns have bullets in them?
A. Where we were going, the place we were going to rob, that place has a lot of people who sell drugs and also a lot of criminals, and when they go, they're ready also.
Q. I don't understand what that means. Can you explain?
A. They are searched before they go inside of the cockfighting club. They get searched for guns, but even if they don't have their guns with them, they still might carry a blade in their hand.
Q. And you brought guns to shoot them; true?

A. I wasn't bringing one with that in mind.
Q. But if necessary, you were prepared to shoot them?
A. You could say so.
Q. What do you say?
A. Yes.
Q. Now, during this robbery we're talking about, someone actually did get shot, right?
A. That is correct.
Q. And after the person was shot, money was taken?
A. Yes.
Q. I'd like to briefly go through your criminal history. When did you come to the mainland United States?
A. I believe it was in 1993.
Q. And when did you first start taking drugs?
A. I started smoking marijuana around '95 or '96. I don't know exactly when it was.
Q. And then in 2004, you were arrested for a federal crime?
A. That is correct.
Q. And you were arrested for running a heroin crew, correct?
THE INTERPRETER: I'm sorry. Could you repeat it?
MR. SCHOLAR: You were arrested for running a heroin crew, correct?
A. Yes.
Q. And this crew controlled six spots?
A. Yes.

Q. And IT had involvement with robberies, correct?
A. I did not understand that question.
Q. And this crew also had involvement with robberies, correct?
A. Depending on which year you're referring to.
Q. Well, which years did you and your crew -- withdrawn.
Which years was your crew involved with robberies?
A. They were involved in one robbery in 2001.
Q. They or you?
A. No. I was with them.
Q. And you began cooperating on that case, correct?
A. Yes.
Q. And in September of 2007, you were sentenced, correct?
A. Yes.
Q. And you received a sentence of 84 months?
A. That is correct.
Q. And you faced a sentence of 30 years to life?
A. Yes.
Q. And from the time that you were arrested until the time that you were sentenced, were you free or were you incarcerated?
A. I was incarcerated.
Q. So, you were already incarcerated for about 36 months when you were sentenced?
A. I hadn't figured out the exact amount of time, but yes, I had been in jail for quite a while.

Q. And that time that you served, that counted towards that 84 months, correct?
A. That is correct.
Q. And there was time taken off your sentence that you served in jail, correct?
A. Yes.
Q. When you were released from jail from that 2004 case, you went on supervised release?
A. Yes.
Q. And you started supervised release on that case in about June of 2010?
A. Yes.
Q. And in December of 2012, you were violated, correct?
A. Yes.
Q. And that was for possession of a weapon?
A. Yes.
Q. And the government recommended that no action be taken?
A. That is correct, because the weapon that was being discussed was a small knife that I used for my job.
Q. And then you went back on supervised release in June of 2013, correct?
A. I was always on supervised release from 2010 to 2017.
Q. So, in April of 2016, you were violated again?
A. That's correct.
Q. And that was for possession of drugs, correct?

A. That is correct.
Q. And when your probation officer asked you about it, you lied to him, right?
A. Yes.
Q. And what did you lie about?
A. About having used heroin.
Q. And for that violation, the government recommended no action as well?
A. They made me do an outpatient drug program.
Q. But you didn't go to jail, correct?
A. No.
Q. And in June of 2016, the prosecutors asked you about the incident with your wife?
A. Yes.
Q. And when your probation officer -- withdrawn.
When the police came about that incident, you lied to the police, correct?
A. First of all, I alerted my probation officer that there had been a problem with my wife.
Q. But when the police came, you told them you didn't hit her, correct?
MS. ZVEROVICH: Your Honor, Mr. Scholar is mistaken as to the date.
THE COURT: All right. Could you remind us of the date.

BY MR. SCHOLAR:
Q. Let me ask it this way. Mr. Rivera, when were you arrested for hitting your wife?
A. I was never arrested for hitting my wife.
Q. Did you talk to the police about hitting your wife?
A. They spoke to me.
Q. And you told them you didn't do it, right?
A. At that time, well, that is what I told them, that I had not hit her.
Q. And a violation was filed based on that striking of your wife?
A. Yes.
Q. What happened with that violation?
A. I was on the run from parole. I did not report to parole.
Q. You also tested positive for drugs while you were on supervised release?
A. Yes, that's correct.
Q. And in June of 2016, you were violated for testing positive for narcotics?
A. That is correct.
Q. And you tested positive for heroin, correct?
A. Yes.
Q. And you tested positive for codeine?
A. No.
Q. You tested positive for hydromorphone?

A. Yes.
Q. What is hydromorphone?
A. That was the substance that the drugs were cut with.
Q. And you also tested positive for morphine, correct?
A. Yes.
Q. And you lied to your probation officer about using heroin, correct?
A. That is correct.
Q. And what happened to that violation?

THE INTERPRETER: I'm sorry?

MR. SCHOLAR: And what happened to that violation?

A. They put me under stricter conditions in the program I was in, and I had to go see the people who were giving me treatment twice a week.
Q. But you didn't go to jail, right?
A. No.

THE COURT: When you get to a good stopping point, we'll break for lunch.

MR. SCHOLAR: I would stop here, Judge. That's fine. I can stop here.

THE COURT: We will take a half-hour lunch break and resume at 1:00.

(Continued on next page)

(Jury not present)

THE COURT: Mr. Rivera, you're free to go.

(Witness not present)

THE COURT: Would counsel like to raise anything?

MS. ZVEROVICH: Nothing from the government, your Honor.

MR. SCHOLAR: No, your Honor.

THE COURT: Mr. Scholar, when the court reporter asks you to repeat your question, I think it's generally because you're very clear at the beginning of the question, it goes too fast and then it gets mumbly at the end.

MR. SCHOLAR: I understand, Judge. I think it's just because I move away from the mike.

THE COURT: Pardon?

MR. SCHOLAR: That's what happens. I think I move away from the mike.

THE COURT: I see.

MR. SCHOLAR: And then the mike doesn't pick the rest of what I'm saying up, so I'll try to stay at the mike a little longer.

THE COURT: OK.

All right. We're on a lunch break.

MS. GRAHAM: Thank you, your Honor.

(Luncheon recess)

AFTERNOON SESSION

1:00 p.m.

(Jury present)

THE COURT: We are ready to resume, Mr. Scholar.

BY MR. SCHOLAR:

Q. Mr. Rivera, before we took a break, we were going through your criminal history, and I'd like to continue.

In August of 2016, you tested positive for heroin again?

A. Yes.

Q. And you told the probation officer you used one bag of heroin?

A. I did tell them -- one time I admitted that I had used some, but I don't remember whether it was on that day or some other day.

Q. And when you were violated, did you have to come back to court?

A. That's correct.

Q. And there was a hearing scheduled for September 9, 2016. Do you remember that?

A. Yes.

Q. And you didn't show up, correct?

A. Yes.

Q. Then on September 28, 2016 you admitted to your probation officer that you used drugs right before court?

A. Yes.
Q. And what does that mean? Did you use drugs before coming to this building?
A. I had to report to the probation officer, yes.
Q. And the probation officer is located in this courthouse?
A. Yes, it's located in this building.
Q. And the government recommended that no action be taken, correct?
A. That's correct.
Q. Now, on direct examination, you testified that you used a substance to defeat drug tests?
A. Yes.
Q. What was that substance?
A. I took a substance people called *chinita*.
Q. How many times did you take that substance?
A. Several times.
Q. During the times you were taking that substance, your probation officer asked you if you were doing drugs, correct?
A. I got confused by the question.
Q. Part of your responsibility under supervised release is to report to probation in this building, correct?
A. That is correct.
Q. And when you report to this building, part of the reporting process is to take a urine test, correct?
A. Yes. That is up to the probation officer. If she tells

you you have to take one, then yes. And if she doesn't tell you, then no.
Q. And when you report, didn't the probation officer ask you if you were taking drugs?
A. Yes.
Q. And what did you tell them?
A. I said no.
Q. And that was a lie, correct?
A. That's correct.
Q. And how many times did you lie to your probation officer?
A. Many times.
Q. When you entered the rehab, the drug treatment facility, did you still come to court?
A. Yes, I had several court hearings.
Q. Is your testimony that during this time you were engaged in a drug conspiracy with Gabriel Guillen?
A. Well, I never sold to him when I was in the program, but I did know what he was doing, and I had spoken to him, and we had reached a mutual agreement that when I got out, I would become involved in his drug business working for him.
Q. And during that time you were still coming to this building, correct?
A. Yes, I had to appear in this building.
Q. And you were still reporting to your probation officer?
A. At that time I did not report to my probation officer. I

had like three court hearings, but I did not have to report to the probation officer at that time.
Q. But you would see the probation officer at court, correct?
A. Yes, I did.
Q. And you didn't disclose that you were engaged in a drug conspiracy to the probation officer, correct?
A. No.
Q. And then in May of 2017, you fled, correct?
A. Please allow me to clarify that it was not in May of 2017. It was in the month of March.
Q. We're going to switch topics for a second.
Now, during your direct testimony, you mentioned some people named Indio, Melo, Uh-Oh. Do you remember that?
A. Yes.
Q. And those were your customers, right?
A. Yes, I did make some sales to them.
Q. And when they wanted to reach you, how did they contact you?
A. Indio would call me on my phone, and Melo would call Gabriel's phone.
Q. And during this time that you were dealing with Indio and Melo, what was your phone number?
A. I don't remember it right now. I had several different numbers.
Q. Do you remember any of the numbers that you used?

A. No.
Q. Were you able to ever provide any phone numbers that you used to the government?
A. No.
Q. Now, today you testified that in the bullpen Wilson said the guns in the apartment were his, correct?
A. Yes, in the beginning he did.
Q. And you told the government in the bullpens Gabriel said he didn't know anything about the guns, correct?
A. That's correct.
Q. You testified, I believe yesterday, that there was a conversation during the NBA finals at Joel's shop?
A. Yes.
Q. And you testified that guns were discussed during that conversation, correct?
A. Guns were not discussed in that conversation. The subject that was discussed was that we were going to have to move and that we had to start cutting people out, because it was very dangerous for them to know where we were because we were selling a lot of drugs and making a lot of money so it would be dangerous to know where we were. And we were talking about how since we did not have any guns, that if there were any kind of confrontation, we couldn't defend ourselves. So that's when Joel said that was why he always had his piece in case of anything happening.

Q. So you were close with Gabriel, correct?
A. You could say that.
Q. And how about Wilson?
A. Did you say Wilson or Los?
Q. Wilson.
A. I used to talk to him. I wasn't as close as with Gabriel.
Q. You testified that you were not allowed to go into the apartment when Joel was there, correct? Yes or no.
A. I was allowed to when Joel was living in the apartment.
Q. You weren't close to Joel, correct?
A. I would talk to him but not like with Gabriel.
Q. You were arrested in August of 2017?
A. Yes.
Q. And then after your arrest, you saw a judge?
A. After I was arrested, I was taken to the hospital and the following day to the judge -- I saw the judge.
Q. And then at some point you were brought into this courtroom before Judge Wood, correct?
A. That is correct.
Q. And you had to appear at what is called status conferences, correct?
A. Yes.
Q. And what is a status conference?
A. They were discussing the status of the case and the evidence and when the trial would be held.

Q. How many status conferences did you attend?
A. Three, I believe.
Q. And during the first status conference, you were told that all defendants would receive discovery, correct?
A. Yes.
Q. And you received discovery, right?
A. No.
Q. Did you testify at a hearing on June 18? A few days ago.
A. Yes.
Q. And at that time, didn't you testify that you received discovery?
A. At that time I understood I was being asked whether I had seen the discovery.
Q. And had you seen the discovery?
A. I had seen part of some of our discovery.
Q. Your first meeting with the government was in December of 2017, correct?

THE INTERPRETER: I'm sorry, the date again, Counsel?

MR. SCHOLAR: December of 2017.

A. No, I had also seen the government before then.
Q. When?
A. I'm not sure. I believe it was around November, but I'm not exactly clear.
Q. That was four months after your arrest, right?
A. I do know that I went.

Q. But my question is, that was at least four months after your arrest, correct?
A. Yes, I saw them. Yes. Yes, I saw them.
Q. And during that time you were also seeing the discovery, correct? I'll withdraw that question.
Let me ask it this way: In those four months between August and November -- or August and December, you're seeing the discovery, correct?
A. I saw discovery. Maybe I saw discovery during that time period, but I really don't remember.
Q. Let me ask you about the shop.
You told the government that --
THE INTERPRETER: One second, counselor.
A. I just told you that I saw discovery, but to tell you exactly the time frame within when I saw it, I don't remember.
Q. You're saying that you could have seen discovery after you started meeting with the government?
A. I think it was before.
Q. Let me move on to the shop.
Now, you testified that you met Joel at the end of May or June of 2017?
A. I met him in the month of April, at the end of April.
Q. Do you remember meeting with the government in November of 2017?
A. Yes.

Q. And AUSA Graham was there?
A. That is correct.
Q. Your attorney, Stephen Brill, was there?
A. Yes.
Q. An interpreter was there?
A. Yes.
Q. And a law enforcement agent was there as well, correct?
A. Yes.
Q. And at that time you told them that you met Joel at the end of May or June, correct?
A. Well, I don't remember that, but I do know that I met him at the end of April or the beginning of May. Maybe I got confused with the date.
Q. In November of 2017 or today? When were you confused?
A. In November of 2017.
Q. Now, you told the government that you had been to the shop about eight times, correct?
A. I told them that I went several times.
Q. And there were times that you were inside the shop?
A. Yes.
Q. And there were times that you remained outside of the shop?
A. That is correct.
Q. Now, in June of 2017, during the NBA finals, were you inside the shop or outside of the shop?
A. We were inside.

Q. And when you went to the shop, what route did you take?
A. I'm not that good giving you street names. I know how to get places, but to tell you the street names, I'm not that good.
Q. How many times did you make this trip?
A. Quite a few times.
Q. And you don't remember any of the street names?
A. I didn't have to look at the street names. I knew how to get there.
Q. When you entered the shop, did you enter it from the garage area or through the front?
A. You had to go in through the front until you got to the garage.
Q. And there were times you went in through the garage?
A. Yes.
Q. You testified yesterday that's where the TV was, right?
A. Yes.
Q. I'd like to talk now about your relationship with Gabriel.
When did you enter the drug treatment facility?
A. I believe it was on December 22.
Q. How soon after you entered the facility did you start speaking with Gabriel?
A. Like two days later.
Q. And you indicated that you spoke to Gabriel at least 12 hours a day?

A. 12 or more.
Q. And that was as soon as two days after you got into the facility?
A. No.
Q. Didn't you just say two days?
A. Yes, I did say that I started talking to him two days after, but I didn't say the two days after I was speaking to him 12 to 14 hours a day.
Q. So prior to going into the drug treatment facility, what drug were you using?
A. Heroin.
Q. How much?
A. Around that time, one or two bags a day.
Q. And you had some difficulty getting into the treatment facility, correct?
A. Yes.
Q. And the treatment facility wanted you to detox, correct?
A. That is correct.
Q. And you didn't do that, correct?
A. No. To enter the program I did have to do that.
Q. And where was that done?
A. I went to Metropolitan Hospital in Manhattan.
Q. And while you were in the rehab, did you take drugs?
A. No.
Q. And when you were arrested, you indicated the police had to

take you to the hospital?
A. I asked them to take me.
Q. Why was that?
A. I didn't feel good.
Q. Why didn't you feel good?
A. Because I was using drugs.
Q. And while you were at the MCC, you took drugs, correct?
A. Yes.
Q. And that was because you were having withdrawal symptoms. Is that correct?
A. Yes.
Q. What kind of drugs did you get at the MCC?
A. I told you that I smoked K2. I asked for Percocet. I used *chinitos*. I was given methadone.
Q. And you got drugs from prisoners, correct?
A. Yes.
Q. On Tuesday, you told the prosecutors that you are currently living at GEO?
A. That is correct.
Q. What is GEO?
A. GEO is a private prison.
Q. When did the government first place you in GEO?
A. I believe it was on January 19.
Q. Didn't the government place you in jail in August of 2018?
A. No.

Q. Now, I'd like to talk about the meetings you had with the government.
A. OK.
Q. Now, you met with the government in May of 2019?
A. Yes, I met with them in May.
Q. And you told the government at that time that you had never used crack, correct?
A. That is correct.
Q. But you told Gabriel that you would be able to help him process the drugs, correct?
A. That is correct.
Q. At that meeting, didn't you tell the government that you never would have associated with Gabriel if you knew he had guns?
A. Yes. If someone had guns, I just did not hang out with that person.
Q. But you'd been using guns since the Nineties, correct?
A. That's correct.
Q. Yesterday you testified that Joel moved out of the apartment in May, correct?
A. May or June, I'm not certain when he moved out. I didn't see him when he moved out.
Q. My question was, did you testify that he moved out in May?
A. I said that he moved. I don't know specifically the date. I said it could have been May or it could have been June.

Q. Yesterday the prosecutor had asked you when you were first allowed to go inside the apartment. Do you remember that?
A. Yes.
Q. And you said you thought it was the end of May, correct?
A. That's what I thought.
Q. And the prosecutor asked you if you understood why you could enter the apartment, correct?
THE INTERPRETER: I'm sorry, counsel.
Q. I'm sorry. The prosecutor asked you if you understood why you could enter the apartment, correct?
A. Yes.
Q. And you testified that Gabriel explained to you that Joel had moved out, correct?
A. Yes.
MR. SCHOLAR: Judge, could I just have one second?
THE COURT: Sure.
(Pause)
MR. SCHOLAR: Thank you, your Honor.
Q. I'd like to talk about the conversation from the NBA finals. That was in June of 2017?
A. I think it was at the end of May.
Q. You don't remember telling the government that it was in June?
A. Yes, and I made a mistake because in June we saw the finals, and that was in Gabriel's apartment.

Q. So my question is about the conversation you had in the shop.
A. OK.
Q. How long were you in the shop when you had this conversation?
A. A long while had gone by.
Q. And you were in the garage portion of the shop?
A. Yes.
Q. And you told the government that sometimes you would go to the shop and wait outside?
A. Yes.
Q. How many times did you wait outside?
A. I don't remember, but it was whenever I didn't feel like going in, I would wait outside.
Q. Was it more than twice?
A. Yes.
Q. More than five times?
A. It could be more than three or four times.
Q. So more than two, not as many as five?
A. It's possible.
Q. And how many times were you inside the shop?
A. Inside the shop, I was in there for about four or five times. But many more times I was in the area of the shop outside in the front. There was no need for me to go inside the shop.

Q. Did you know that Joel had a security camera at the shop that recorded 24 hours a day?
A. Well, I had seen the camera, but I don't know if it recorded 24 hours or not. I never asked that.
Q. Now, yesterday you said that the government asked you to listen to certain phone calls?
A. That is correct.
Q. And when did they ask you to do that?
A. Several days ago.
Q. Can you be more specific than that?
A. They asked me to do it last Saturday.
Q. And during that meeting, they asked you to tell them who you thought was speaking on the telephone calls, correct?
A. I was asked if I recognized the voices on the call.
Q. And when you recognized the voices, if you did, what did you do?
A. I would put down my initials.
Q. Where?
A. On a yellow thing which was in the front right of these pages.
Q. And would you tell the government who you thought was the individual speaker?
A. That is correct.
Q. And you're saying this happened five days ago?
A. Yes. They did this on Saturday.

Q. And how many calls did they ask you to listen to?
A. I don't remember, but there were a lot of them.

MR. SCHOLAR: Thank you, Judge. I have nothing further.

I'm sorry, Judge. Can I just have one moment?

THE COURT: Yes.

MR. SCHOLAR: I just had one other question.

Q. You testified that the police brought you to the hospital the day of your arrest?
A. That is correct.
Q. Was that because you were doing heroin?
A. Yes.
Q. How many bags a day of heroin were you doing?
A. Ten or 12.
Q. A day?
A. Yes.
Q. How would that make you feel?
A. If I didn't use that, I felt sick.
Q. Would it cause any problem in seeing things?
A. No, but I couldn't eat. I had the shakes. I was cold. I had chills. I had diarrhea.
Q. Could you concentrate?
A. Not at that moment.

MR. SCHOLAR: Thank you. I have nothing further.

THE COURT: Maybe it's a good time to stand and

stretch if you'd like.

REDIRECT EXAMINATION

BY MS. ZVEROVICH:

Q. Your Honor, just a few redirect.

Mr. Rivera, you just testified that you had shakes, cold, chills and other symptoms. Do you remember that?

A. Yes.

Q. Were you talking just about the day of your arrest?

A. I wasn't feeling that way on the day of my arrest. I was feeling a little bit ill, and that's why I asked to be taken to the hospital. But I did know that if I didn't get something to counteract the heroin that I was going to feel that way because I had gone through it before.

Q. When did you have trouble concentrating?

A. A long time before I caught the case that I was charged with, when I went into the drug program and I had to go for several days without any medication. I felt ill, I got fever and the diarrhea.

Q. While you were working for Gabriel between April and August of 2017, you were using heroin, correct?

A. Yes, that is correct.

Q. And were you using regularly at that time?

A. Yes.

Q. And when you were using heroin, was that affecting your

ability to concentrate?
A. No.
Q. Did it affect your memory?
A. No.
Q. Now, do you remember on cross-examination defense counsel asked you whether in the bullpen Wilson had said that the guns in the Cross Bronx apartment were his, and you responded, "Yes, in the beginning he said that." Do you remember that?
A. Yes. I answered that way because that's what happened at first. We were in the bullpen with Wilson and some other people. That's what happened. But then later on we all got -- all of us who were on the case met up again in the bullpen.
Q. And just to clarify, what was it that Wilson said during the first conversation?
A. In that first conversation when we were in the bullpens, I asked Wilson, and Wilson told me yes, they belonged to him. He told me that he said that they were his because at the time they had his parents handcuffed and his parents had nothing to do with that, so he said that those were his.
Q. When you say he said those were his, who did he say that to?
A. He was telling me, but he had had the police in front of him and everything, and he was telling me about it.
Q. So he was telling you that he had said to the police what?
A. He told me that when the police came into the apartment,

they asked about guns and drugs, and he said yes. He told them there were drugs in the bedroom. Then they searched the apartment, and they asked him who does this gun belong to. And they told him that he'd better tell them because if he didn't, they were going to arrest his parents, and he said they belonged to him.

Q. And did Wilson tell you whether or not that was true, what he said to the police?

A. I asked him, and he told me no, the guns did not belong to him. He said that he just didn't want his parents to be taken under arrest, and that's why he had to lie and say they belonged to him.

Q. Now, Mr. Rivera, do you remember on cross-examination you were asked about your meetings with the government?

A. Yes.

Q. You first met with the government on September 20, 2017. Is that right?

MR. SCHOLAR: Objection, Judge. Leading, Judge. It's redirect.

THE COURT: I'll permit it. Go ahead.

A. Yes.

Q. And at that meeting, did you talk to the government about some of the things that you testified about today?

A. I talked about several different things.

Q. And did you talk about Joel Tapia?

A. Yes.
Q. Now, you testified that you now live in GEO. Is that right?
A. That's correct.
Q. And that's a private jail?
A. That's correct.
Q. And you said that initially you were at the MCC?
A. Yes.
Q. Were you moved from the MCC to GEO for your own safety?
MR. SCHOLAR: Objection. It is leading, Judge.
THE COURT: Sustained.
Q. Mr. Rivera, why were you moved from the MCC to GEO?
A. Well, actually, I was there with my co-defendants, and I did not feel safe.
Q. And why did you not feel safe?
A. Well, sometimes they wanted to talk, and they didn't want me around there or anything, and they had started looking at me weird. And one of them was saying to me, "Be careful to make sure you're not talking."
Q. Now, Mr. Rivera, do you remember you were asked questions on cross-examination about Joel's shop?
A. Yes.
Q. And you testified that you were in the area of the shop outside more times than you were in the front -- I'm sorry, more times than you were inside the shop. I misspoke.

THE COURT: Just a moment.

MR. SCHOLAR: Judge, I think that mischaracterizes the testimony.

THE COURT: Sustained.

BY MS. ZVEROVICH:

Q. Mr. Rivera, you testified you went inside the shop a few times. Is that right?

A. Yes.

Q. Were there also times when you traveled to the area of the shop, but you did not go in the actual shop?

A. I did that on several occasions.

Q. And when you did that, where was it that you waited?

A. I would stay in front of or across from the shop inside of the car, either in the street or outside.

Q. Now, do you remember that on cross-examination Mr. Scholar asked you several questions about your supervised release between 2010 and 2016?

A. That's correct.

Q. And you testified that in 2016 you began to have issues again with drug use, right?

A. That's correct.

Q. Did the Court send you to a drug treatment program for those issues?

A. That's correct.

Q. And was it in that program that you met Gabriel Guillen?

A. Yes.

Q. Now, were you treated any more leniently on your supervised release because you had been cooperating with the government in your 2004 case?

MR. SCHOLAR: Basis of knowledge, Judge. Objection to the basis of knowledge.

THE COURT: You need to elicit a foundation.

MS. ZVEROVICH: One second, your Honor.

MS. GRAHAM: Your Honor, it's his understanding.

THE COURT: I think it is a bit too vague.

BY MS. ZVEROVICH:

Q. Mr. Rivera, while you were on supervised release, you had contact with your probation officer and the courts. Is that right?

A. Yes.

Q. And what is your understanding as to whether or not you received lenient treatment in your supervised release based on your cooperation in the prior federal case?

A. Could you please explain that question to me again because I don't -- I don't understand it.

Q. So when you were in contact with your probation officer and the court while you were on supervised release, did you feel like you were getting more lenient treatment because you had been a cooperator?

MR. SCHOLAR: Objection to the form of that question.

THE COURT: More than what?

MR. SCHOLAR: To the form of that question --

THE COURT: Yes. I will permit it, but I think you need to elicit more information from him before you ask that question. In other words, more lenient treatment? More than whom? More than he would have been allowed before? More than someone else?

Q. Mr. Rivera, did you feel like you were getting treated leniently because you had been a cooperator in your 2004 case?

A. Now I understood the question. No, I was getting treated just the same as anyone else.

Q. Mr. Rivera, have you pleaded guilty to all of your outstanding supervised release violations?

A. Yes.

Q. Did you admit to drug use while on supervised release?

A. That is correct.

Q. Did you admit to the incident with your wife?

A. That is correct.

Q. And did you plead guilty to those supervised release violations in front of this Judge in this courtroom or a different judge?

A. No. I pleaded guilty before the Honorable Judge Denise Cote.

Q. And will Judge Cote sentence you for those violations of supervised release?

A. That is my understanding.
Q. And is your understanding that your sentence will be separate from the sentence you will get in this case before this Judge?
A. Yes.
Q. Mr. Rivera, again, what is your understanding as to what would happen if you lied today in court?
A. That the agreement I have with the government would be torn up.
Q. And could you be charged for any new crimes for lying?
A. Yes, that's correct.
Q. And in all of the times that you've met with the government in this case, has the government ever told you to say anything but the truth?
MR. SCHOLAR: Objection, Judge.
THE COURT: Sustained.
MS. ZVEROVICH: No further questions, your Honor.
MR. SCHOLAR: Just very briefly.
RECROSS EXAMINATION
BY MR. SCHOLAR:
Q. Now, for one of your violations of supervised release, you came to court high, correct?
A. Yes.
Q. Did they send you to jail?
A. No.

Q. Now, you said that you did not feel safe at the MCC?
A. That was correct.
Q. And you asked to be moved, correct?
A. Yes.
Q. Who did you ask?
A. I asked the government to move me.
Q. And did they move you?
A. I believe so.
Q. You testified that you went to the shop?
A. Yes.
Q. Sometimes you were on the garage side?
A. Yes, outside.
Q. Where was the camera? Where was the camera?
A. The camera was behind the shop, inside or outside the shop on the corner.

MR. SCHOLAR: Thank you.

Nothing further, Judge.

MS. ZVEROVICH: Nothing further, your Honor.

THE COURT: Thank you very much, Mr. Rivera. You may step down.

(Witness excused)

THE COURT: Feel free to stand and stretch.

MS. GRAHAM: Your Honor, should we bring the next witness?

THE COURT: Yes, the next witness is entering. Please

have a seat.

MS. ZVEROVICH: Your Honor, the government calls Ryan Stewart to the stand.

THE COURT: Thank you. Please come forward to the witness stand.

RYAN STEWART,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. ZVEROVICH:

THE WITNESS: Ryan Stewart. R-Y-A-N. Last name is S-T-E-W-A-R-T.

THE COURT: You may begin.

Q. Good afternoon.

Where do you work?

A. I am a state trooper for the Ohio State Highway Patrol.

Q. How long have you been an Ohio State trooper?

A. For a little over 18 years.

Q. What are your duties and responsibilities as an Ohio State trooper?

A. To patrol the highways within the state of Ohio. We investigate crashes, enforce traffic laws, as well as criminal laws, assist motorists.

Q. And during your tenure as an Ohio State trooper, were you ever a K9 handler?

A. Yes, I was.
Q. What does that mean to be a K9 handler?
A. You are assigned through an interview process. You have to apply for the position, and during the interview process you get awarded the position as a K9 handler. And by being a K9 handler you become assigned to the criminal patrol unit, and then you are trained with a K9 partner that you work throughout the animal's tenure.
MS. GRAHAM: Your Honor, I apologize. I think we forgot to swear Mr. Stewart in.
THE COURT: My deputy did swear him in, didn't you, Sarah?
DEPUTY CLERK: Yes, your Honor.
MS. GRAHAM: I'm so sorry.
THE COURT: That's all right. I think the voice was soft.
Q. What does a K9 handler do?
A. When you're first awarded that position, you attend a K9 handler school with a master trainer. At the time it was a contracted trainer that the highway patrol had a contract with.
You are paired up. Usually the trainer will pair you up with a dog that kind of fits you, and then throughout the four-week school, you learn to work in unison essentially with the dog, and then working on the different aspects of the job.
My dogs that I worked were both "narcotics only" dogs,

so the majority of our work and training in school and outside of school was related to narcotics.
Q. And when you say that your dogs were "narcotics only" dogs, what were they trained to do?
A. They were trained to detect the odor of the narcotics that they're trained to, which was marijuana, cocaine, methamphetamine, heroin and any of the derivatives.
Q. Is crack one of the derivatives of cocaine?
A. Yes, it is.
Q. How long were you a K9 handler, from when to when?
A. I received my first assignment or first K9 in April of 2004, and I worked that dog until July 2011. And then I received a second one in January 2012 and worked that one until June of 2017.
Q. What happened in June of 2017?
A. My second one passed away.
Q. Are you currently a member --
THE COURT: You need to slow down a bit for the court reporter.
Q. Are you currently a member of any federal law enforcement task force?
A. Yes, I am.
Q. Which task force?
A. The DEA, Northwest Ohio, HIDTA, a drug task force out of Toledo.

Q. How long have you been a DEA task force officer?
A. I started working with that group in July of last year and became officially sworn in in December of last year.
Q. What are your duties and responsibilities as a DEA task force officer?
A. I work with the office. We investigate larger scale cases. We also conduct surveillance, monitor phones, physical electronic surveillance. And then as part of my job being assigned there and still being an Ohio State trooper, then I also respond as the criminal patrol investigator to any highway patrol drug or money seizures.
Q. Let me direct your attention to January 10 of 2017. Were you on duty that day?
A. Yes, I was.
Q. What was your assignment that day?
A. At that time I was still a K9 handler, and I was assigned to work traffic with the emphasis on criminal patrol on the highway.
Q. And where were you that day? Where were you stationed?
A. I was assigned to the current district that I am still a member of which is the Findlay, F-I-N-D-L-A-Y, District Criminal Patrol Unit.
Q. Is that in Ohio?
A. That's in Ohio, correct.
Q. Were you in a marked car or an unmarked police car?

A. It was a marked vehicle.

THE COURT: Again, before you ask a question, pause a bit so that the court reporter can keep up.

Q. And did you conduct a traffic stop on that day?

A. Yes, I did.

Q. Approximately what time?

A. Approximately 6:00 in the morning.

Q. What car did you stop?

A. It was a Honda Odyssey minivan.

Q. What color?

A. Like a light blue, greenish color.

Q. In which direction was that car traveling when you stopped it.

A. It was traveling westbound.

Q. On what road or highway?

A. In Ohio it would be the Ohio Turnpike, which is Intestates 80 and 90.

Q. When you stopped the car, how many people were inside?

A. Just one, the driver.

Q. Did the driver identify himself?

A. Yes, he did.

Q. How did he identify himself?

A. With a New York driver's license.

Q. What was the driver's name?

A. Wilson Guillen.

Q. Let's pull up Government Exhibit 3 in evidence and publish it to the jury.
Do you recognize this person?
A. Yes, I do.
Q. Who is it?
A. Wilson Guillen.
Q. Is that the person you stopped on January 10, 2017?
A. Yes, it is.
Q. We could take that down, Ms. Connolly?
During the stop, did you deploy a narcotics-trained dog near the car?
A. Yes, I did.
Q. Which dog did you deploy?
A. It was my dog at the time, which was Oso.
Q. Where did you get Oso from?
A. He is secured in a kennel that's behind the driver's seat in my vehicle.
Q. Was Oso a certified narcotics dog at that time?
A. Yes, he was.
Q. What was Oso trained to do?
A. To detect the odor of narcotics.
Q. Which narcotics?
A. Marijuana, cocaine, methamphetamine, heroin and their derivatives.
Q. And what was Oso trained to do if it detected the odor of

any of those narcotics?
A. His -- what we call a trained find final response, which is the indication that they're supposed to show when they do detect that odor -- was an aggressive indication, and he was trained to scratch.
Q. What, if anything, did Oso do once it was near the car?
A. Initially he had pulled me up to the vehicle and alerted to the vehicle. And the alert is different than an indication. The alert is the change in the dog's behavior. And then he began working the passenger side of the vehicle after the alert.
He had pulled around the driver's side to the rear and then back to the passenger side and then began what we call a bracket, where they are narrowing down a scent cone or an odor, it's like a scent cone. Ultimately, he alerted a second time at the rear seam of the right rear door, which would be the sliding door and indicated by a scratch at that door.

(Continued on next page)

BY MS. ZVEROVICH:
Q. And after Oso alerted to the possible presence of narcotics, what did you do?
A. The driver, Mr. Guillen, was removed from the vehicle. He -- we explained to him what had happened and what was going to happen next, which was a probable cause search. And then due to the weather conditions that morning, we moved the Honda Odyssey off of the interstate and up to the toll gate, or the toll plaza at exit 64.
Q. And did you conduct a search?
A. Yes, we did.
Q. And what, if anything, did you find in the Honda van?
A. We had located, in the spare-tire compartment, which is located between the front seats and the first row of passenger seats in the back, a plastic -- once the floor is opened up to access that spare-tire compartment, there was a plastic tray that the tire would sit in. The tire was not in there. It was actually laying in the back, in the rear cargo area.
Once we removed the tray, the liner, from the spare-tire area, looking from rear to front -- so towards the engine of the van -- there was a cutout in the floor or that area of the spare tire approximately ten inches wide with a hinge on one side of it that was effectively a trap door to a hidden compartment underneath the floor.
Q. And did you look inside the hidden compartment?

A. Yes, I did.
Q. What, if anything, did you find in the hidden compartment?
A. We found several vacuum-sealed packages of U.S. currency.
Q. And what did you do next?
A. Mr. Guillen was then explained what was found and that we would be taking him as well as the vehicle to our highway patrol post in Bowling Green. Once the vehicle was at the post, then we thoroughly inspected the compartment and then conducted a thorough search of the vehicle to make sure that there's no other compartments found. We then removed any contraband or in this case U.S. currency from the compartment.
Q. And what did you remove from the compartment?
A. A total of three vacuum-sealed packages of U.S. currency.
Q. Now, Trooper Stewart, please take a look at Government Exhibit 20 for identification. You should have a physical copy, and it's also going to be on the screen.
A. You said 20?
Q. 20.
A. OK.

THE COURT: And Trooper, it would be best if you speak a little more slowly, and articulate.

THE WITNESS: OK.

BY MS. ZVEROVICH:
Q. Trooper Stewart, do you recognize those photographs?
A. Yes, I do.

Q. What are they?
A. These are photos that were taken the morning of the seizure, and these were taken in the garage of the Bowling Green highway patrol post.
Q. Did you take those photographs?
A. I don't recall taking them. Usually somebody from the team outside of the initiating, whoever initiated the traffic stop would take photos.
Q. Do these photos fairly and accurately depict the van and its contents as you saw them on January 10, 2017?
A. Yes, they do.

MS. ZVEROVICH: Your Honor, the government offers Government Exhibit 20.

MR. SCHOLAR: No objection, your Honor.

THE COURT: Government Exhibit 20 is received without objection.

(Government Exhibit 20 received in evidence)

MS. ZVEROVICH: Ms. Connolly, let's publish page 1.

Q. What is this a picture of?
A. Page 1 is a picture of the Honda Odyssey in the garage at the post, the front of it, just indicating how the van appeared the morning it was stopped as well as the license plate number.

MS. ZVEROVICH: Let's turn to page 4.

Q. What are we looking at in this picture?
A. This is a photograph taken from the passenger's side of the

van through the sliding door. It shows the compartment right in front of the -- the seats, the front row or the second row of seats for the passenger area.
Q. Now, is this compartment, is this the hidden compartment you were talking about, or not?
A. This is not the hidden compartment. This is just showing the compartment in the floor, which would allow you to access the spare tire, where it's supposed to be stored.
Q. And where relative to this is the hidden compartment? Is it closer to the front or to the back?
A. It would be closer to the front.
MS. ZVEROVICH: Let's publish page 9.
Q. What is this a picture of?
A. This is a picture of two of the vacuum-sealed bundles of currency that were removed from the compartment.
MS. ZVEROVICH: Let's publish page 11.
Q. What is this a picture of?
A. This is a picture of the total of three bundles of -- vacuum-sealed bundles of currency that were removed.
Q. And what did you do with the currency that you recovered from Mr. Guillen's van?
A. This currency was sniffed independently after the seizure by another dog to determine if there's narcotics or their presence. And then after it is, the currency is put in evidence bags and sealed, and then it is taken to -- at this

time -- or in 2017, we utilized Fifth Third national bank -- or Fifth Third Bank.

THE COURT: Please speak a little more slowly and clearly.

THE WITNESS: Fifth Third, five slash three.

THE COURT: Trooper, I think if you pull your mike down, we won't get feedback.

A. It was taken to Fifth Third Bank. The bank conducts the official count, and then it's converted to a check.

Q. And what was the official count?

A. $56,000.

MS. ZVEROVICH: No further questions, your Honor.

THE COURT: Mr. Scholar.

MR. SCHOLAR: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. SCHOLAR:

Q. Good afternoon.

A. Good afternoon.

Q. So, on January 10, 2017, you were working your normal tour?

A. I had came out early.

Q. And what was your normal tour?

A. My normal scheduled shift is 8 a.m. to 4 p.m.

Q. And you came out early; how much earlier?

A. I believe we came out -- myself and a couple other members of the team -- around -- shoot. I believe it was about 2:00 in

the morning. Not for sure, but it was shortly after midnight.
Q. And you had received information from the DEA about two weeks before?
MS. ZVEROVICH: Your Honor, objection.
THE COURT: Sustained.
Q. Was there a dash cam in your vehicle?
A. Yes, there was.
Q. Was it turned on?
A. Yes.
Q. And do you have the video?
A. I don't have it with me. The -- the attorney's office was provided that.
Q. And how about any body cameras worn by you or your team?
A. We don't wear body cameras. We do wear a microphone on our person, but no body cameras.
Q. And the microphone records?
A. Yes.
Q. Do you have any pictures of the cash in the compartment?
A. I don't know if we had one in here or not. There would have been, because that's usually how we take our photos.
THE COURT: Please speak more clearly.
Q. Did you see any in the exhibits that the government gave you just previously?
A. Look through again just to make sure.
No, sir. In any of these photographs the currency is not

depicted inside the compartment.
Q. And in order to search the vehicle, you had to lay on the floor at one point?
A. Yes. To see the trap door that was within the spare-tire compartment, you have to lay down on the floor, get your head down in the spare-tire compartment.
Q. And were you wearing any gloves or anything over your shoes at the time that you entered the vehicle?
A. They would have been wearing search gloves.
Q. And that was to preserve the interior of the vehicle?
A. We wear, like, leather -- Kevlar-like search gloves, prevent cuts, stabs, needles, or anything like that. Also prevents us from -- a little bit of protection from any chemicals or anything like that as well as we're not fingerprinting things up, either.
THE COURT: Trooper, again, your mike comes up on its own.
THE WITNESS: Sorry.
THE COURT: Could you keep it down.
BY MR. SCHOLAR:
Q. And during the stop, who were you with? What other officers were you with during the stop?
A. During the stop Sgt. Nathan Henn was riding with me, and then trooper Jason archer was out working as well.
Q. And at some point during the stop, you turned off your

audio?
A. Yes. After the conversation that I had with Mr. Guillen in his car, I discussed the traffic stop with Sgt. Henn, which we're permitted to do per policy to preserve any officer sensitive information.
Q. But that was not recorded, correct? After the stop nothing else was recorded?
A. I'm sorry. I don't understand what you're --
Q. After you made the stop, nothing else was recorded, correct?
A. We would -- our camera would run up until the point that we get the vehicle to the post, and then the camera's shut off.
Q. Do you have the video?
A. I don't have it with me.
Q. Now, was the vehicle examined for fingerprints?
A. No, sir.
Q. Was it examined for DNA evidence?
A. No, sir.
Q. And were the bags of cash examined for fingerprints?
A. No.
Q. Were they examined for DNA evidence?
A. No, sir.
MR. SCHOLAR: Judge, I have nothing further. Thank you.
MS. ZVEROVICH: Your Honor, just very briefly.

REDIRECT EXAMINATION

BY MS. ZVEROVICH:

Q. Trooper Stewart, did you turn over all of the dash-cam footage to the U.S. Attorney's Office?

A. Yes.

Q. And did you turn over all the photographs you had in connection with the stop to the U.S. Attorney's Office?

A. Yes, I did.

MS. ZVEROVICH: No further questions.

THE COURT: Nothing else?

All right. Thank you.

THE WITNESS: Thank you, your Honor.

THE COURT: You may step down.

(Witness excused)

THE COURT: Please feel free to stand and stretch while we wait for the next witness.

MS. GRAHAM: Your Honor, actually, we have some binders of already-admitted exhibits to distribute to the jury to facilitate the next witness.

THE COURT: That's fine.

MS. GRAHAM: We'll do that at this time.

THE COURT: Yes.

MS. GRAHAM: Thank you.

We call Special Agent Rafael Rodriguez at this time.

THE COURT: Thank you.

Members Of the jury, as you just heard Ms. Graham say, the prosecutors will be giving you notebooks that are important in connection with the next witness.

MS. GRAHAM: And your Honor, these are not numbered by jurors, so they can begin handing them once they receive them.

THE COURT: OK.

MS. GRAHAM: It does not matter which of the binders they take.

THE COURT: It appears that not every juror has a binder.

MS. ZVEROVICH: Yes, your Honor. We're coming.

RAFAEL RODRIGUEZ,

called as a witness by the government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. GRAHAM:

Q. Mr. Rodriguez, where do you work?

A. Drug Enforcement Administration, Department of Justice.

Q. What's your title there?

A. Supervising special agent.

Q. How long have you been with the drug enforcement agency?

A. Approximately 15-1/2 years.

Q. Are you in a particular unit?

A. Yes, I am.

Q. What unit is that?

A. I am in the drug enforcement task force group tango 43.
Q. What does that group do?
A. We concentrate on international and domestic narcotics investigations.
Q. Where did you work before joining the DEA?
A. I was a New York City police officer for approximately five and a half years.
Q. And I'd like to draw -- well, I'd like to hand you a binder of exhibits that are already in evidence.

MS. GRAHAM: Your Honor, these are the transcript exhibits, as discussed in our stipulation and also with the prior witness.

THE COURT: OK. Thank you.

MS. GRAHAM: Your Honor, just to describe to the jury and yourself, so that everyone may follow along, we're going to read certain, very select portions of only certain calls to conserve and make judicious use of time. So, what I will do before each call is give the exhibit number that we are going to read as well as the page that we're going to be reading from. The jurors are welcome to follow along in their binders. Ms. Connolly will also be displaying that on their screens, and so, if they find it easier to follow along in that way rather than flipping through binders, that's an alternative.

THE COURT: Thank you.

MS. GRAHAM: Thank you, your Honor.

THE COURT: Go ahead.

BY MS. GRAHAM:

Q. Agent Rodriguez, let's begin with the transcript marked 600-02 and the tabs in the binders have the exhibit numbers on them.

THE COURT: So the jurors will be turning to 600-02.

MS. GRAHAM: Yes, your Honor.

Q. Agent Rodriguez, could you please tell me what date this call was placed on?

A. Call was placed February 19, 2017.

Q. And what was the phone number that was being wiretapped at that time?

A. It was 347-301-0144.

Q. And what was the other number?

A. The number that was associated, 347-698-5672.

Q. And who are the parties listed on this call on page 1?

A. Gabriel and Wilson.

Q. Anyone else?

A. Oh, Joel. Excuse me. Sorry about that.

MS. GRAHAM: So, let's begin reading on page 2. I'll read the parts marked Gabriel, and I would ask you to read the parts marked Wilson.

THE WITNESS: Yes, ma'am.

BY MS. GRAHAM:

Q. "(Aside): Hello (unintelligible). I bought a cigarette.

Like to smoke it and I didn't even smoke one. (Unintelligible) that I come over here to smoke a good one."
A. "Hey."
Q. "Hello."
A. "Talk to me."
Q. "What's up?"
A. "Chilling. No, Joel came over."
Q. "Huh?"
A. "Joel, he came."
Q. "OK, OK. (Unintelligible) if --"

MS. GRAHAM: And then there's an unintelligible.

Q. "Joel, but is Joel dry, dry, dry? He doesn't have anything, anything, anything?"
A. "He supposedly needs up to three and a half, if you can, for the light. (Chuckles)."
Q. "OK. No, no, (unintelligible) don't worry. I will get him something. I -- it will arrive shortly. Any minute now."
A. "Oh, OK. Oh, well, let me tell -- let me tell him."
Q. "(Unintelligible)."
A. "So he doesn't get desperate, so he doesn't go somewhere else."
Q. "OK, OK. Wait. Where is this thing? (Aside): Where is the key? I had my key. I had a key here.)"
A. "A key."
Q. "No, the (unintelligible), no, my key, that I don't know

where I put it. My house key."

A. "(Aside): Joel, you there? Oh, wait.) Uh, that, that, let me put him on. Wait. Hello."

Q. "Hello."

A. "Let me put Joel on. Wait."

Q. "All right."

MS. GRAHAM: And now I would ask you to read Joel, and I will read Gabriel.

A. "Hello."

Q. "Uh, tell me. Talk to me."

A. "Tell me, king."

Q. "Uh, here, chilling. You already know. (Unintelligible) already. Like around seven or eight a little something will arrive all at once."

A. "So do I -- so do I wait?"

Q. "Yes, yes, yes. Uh, are you (unintelligible), are you empty, empty, empty?"

A. "Yes, homie, and I have, I have -- dude, like five people waiting for me there, homie."

Q. "(Chuckles). Look, and (unintelligible). Yesterday I had three and a little bit, and I'm like, Look, (F) it. If he takes it (unintelligible) like that. Waiting like, (F) it. Like, for the whole one and to give you half. No, no. I'm telling you. But don't worry. Let me see. You can't do anything with 50. That is too, too little right now, right?"

A. "No. With 50 I can take care of you -- of one."
Q. "OK, because I still have (unintelligible) 15 left, but so that at least you, you know, the 50 that are the fastest for you, because, look, I was going to cook this one that I had there. I stopped (unintelligible) cooking because I need some for the one-one for tonight also."
A. "All right."
Q. "Yes, yes. Well, let me see, dude. Don't worry. Let me see what comes in. I know that it will be today."
A. "But -- and those 50?"
Q. "Oh, well, I will -- I will head over there right now. Don't worry. I will bring it to you."
A. "Do I wait for it here?"
Q. "Yes, yes, yes, yes, yes, yes."
A. "All right."
Q. "All right. (Unintelligible)."
MS. GRAHAM: I'd now like to turn to Government Exhibit 602-26. Let's read from page 3.
Q. But if you could start on the first page, which is the phone number that is being wiretapped in this call?
A. 347-701-0745.
Q. And what is the date of the call?
A. June 2, 2017.
Q. And the participants?
A. Gabriel and Wilson.

MS. GRAHAM: Turning to page 3, I'll read Gabriel if you will read Wilson.

Q. "I also had Joel on the phone, but I know it was -- to collect the 300 and change. He told me he was working now, dude. So, I, in order to collect it now, so I could put everything in order, to -- well, you know."

A. "(Aside): OK. Yeah. Um."

Q. "Huh?"

A. "Uh, uh, uh -- he said to leave him one. Uh-huh."

Q. "Huh?"

A. "And if you can, to bring him one."

Q. "Oh, all -- yeah, yeah. That's why, so we go for this right now, fast-like, you know."

"(Unintelligible in the background.)"

"All right. Hold on. (Aside): Dude."

A. "(Aside): Hey."

Q. "Hold on. Hold on."

A. "Let me see, let me hit him up to see what's going on."

Q. "All right. Yeah. Tell him yes, we'll do it now, to (unintelligible) call (unintelligible) for that, so I can go over there fast and you can throw it to me out the window. (Unintelligible)."

A. "When?"

Q. "Tell him -- tell him I have, tell him I have only one *blanquin*, not, not greasy stuff, just the *blanquiviri*."

A. "Yeah, that's what he wants."
Q. "cool. All right."
MS. GRAHAM: I'd like to now turn to Government Exhibit 602-52.
Q. Who are the -- what date was this call placed?
A. This call was June 22, 2017.
Q. And who are the participants?
A. Jerome and Gabriel.
MS. GRAHAM: And if we could turn to page 5 of this call, I will read Gabriel, if you could read Jerome.
Q. "Listen, Toti, my brother, Joel."
A. "Uh-huh."
Q. "He went ahead and bought it for 32 and a half somewhere else because I had some, but I didn't really push what I had. I told him I didn't have any."
A. "So -- so was it -- so was it heavy? Was it good?"
Q. "No. Smoking. What he got was fantastic, but he got it for 32-1/2, Toti and I give it to him for 31 and 32."
A. "For 32-1/2?"
Q. "He got it for 32-1/2, because I told him that I didn't have any. But Toti, just remember that he owes me money, so I told Wilson --"
A. "Oh, so --"
Q. "So I told Wil --"
A. "Send along that crust. Send along that customer to me.

I'll give it to him for three one. (Laughs)."
Q. "So -- so, then I said to Wilson, Oh, so then he's going to pay more someplace else. Why doesn't he just give it to me so I can give you 500 bucks as a present?"
A. (Laughs) hey, hey, hey, hey, hey.
Q. "You know what I'm saying?"
A. "That's the story. Yeah, I know what you're saying. Really, I do."
Q. "Some -- someplace else he wants to help, but what's up with this slick behavior?"
A. "Shit."
Q. "No. So --"
A. "Yeah, yeah, yeah, yeah."
Q. You know -- you know I know how to play this game. You know that (unintelligible) how to really play this game You know what the thing is with me, Toti? It's not that (unintelligible), but I have the flow, Toti."
A. "Yeah. That's true."
Q. "I have a lot. I have a lot of people, Toti, so many people that I (unintelligible). Eh?"
A. "Too many people."
Q. "That's the story, Toti. That's what, that's what I (unintelligible) those dudes."
A. "Right."
Q. "I'm going to tell Joel (unintelligible). No. I'm going

to take 200 from you just so you can keep your thing."

A. "Uh-huh."

Q. Why? Because I have some. The thing is I'm waiting for the guy to come down to 31 for me, and then he goes and pays 32-1/2, Toti."

A. "So, he paid three, three one and a half? And a whole, whole one? Shit. Just like that? In cash?

Q. "30, 32-1/2. No. On credit, on credit. But Toti, he should just give it to me for 32-1/2."

A. Oh, 32-1/2? What are you thinking about? I'm going to get --"

THE COURT: "What are you talking about?"

THE WITNESS: Excuse me?

THE COURT: "What are you talking about?"

THE WITNESS: I'm sorry.

MS. GRAHAM: I believe it said what are you talking about, not what are you thinking about.

THE WITNESS: Oh. I'm sorry.

A. "What are you talking about? I'm going to get together to buy -- to -- to give it to him on credit for 32-1/2. (Laughs)."

Q. "(Unintelligible), like I said to Wilson, how does he have the guts to --"

A. "Uh-huh."

Q. "-- to store such expensive shit?"

A. "So, how much time do they give him? How much time?"
Q. "No, Toti. This is a matter of opening doors with dudes he doesn't even know."
A. "Get a load of that now."
Q. "And he's going to open up -- like I said to him, Wilson, let me tell you, Wilson, and it's not for nothing I'm going to help him move the half, and I'm -- I'm going to give him 32-1/2. I'm going to give it to him so he doesn't think --"
A. "(Unintelligible). Uh-huh."
Q. "But he shouldn't even think about getting another one."
A. "Of course. That's right."

MS. GRAHAM: I'd like to now turn to Government Exhibit 600-18.

Q. What date was this call placed?
A. February 22, 2017.
Q. What was the phone number being wiretapped?
A. 347-301-0144.
Q. And who are the participants?
A. Wilson and Gabriel.
Q. And if we could turn to the next page and you could read Wilson, please.
A. "Hello."
Q. "Uh, Wilson?"
A. "Yo".
Q. "I was going to say that if you want, let me go pick up the

SUV, van and take out -- take out, um, 50 for me of the pure stuff, the greasy stuff."

A. "Oh, you -- you said the greasy stuff? I took the 50 and the 50 out for you of the other stuff."

Q. And when I just finished reading Gabriel's part, the part that was the greasy stuff, what does it say to the right in the original language?

A. The original on the greasy stuff --

Q. In the end of Gabriel's portion.

A. I'm sorry, ma'am, but I don't --

Q. Sorry. What word was translated as the greasy stuff in the original language to the right?

A. *Grasin*.

Q. Thank you.

"No, no. The other stuff too, but I ran out of what I had now. Do you remember?"

A. "Uh-huh."

Q. "Yeah, but right now -- now they're asking me for, um, um, 30, 20 --"

A. "Right."

Q. "-- and 15. So I'm going to put 15 into 50, and I'm going to press it again."

A. "Oh, shit."

Q. "(Unintelligible) shit."

A. "What? (Unintelligible). What?

Q. "Yeah, the thing is I (unintelligible)."
A. "Dude."
Q. "Uh-huh, and take out 50 for me, 15 of Joel's *cortiviri*, mix it real good. I'm going to go straight up to press it, but throw me down the keys and stuff so you can go get the key -- SUV van, but --"
A. "No. He has the keys over there."
Q. "Did he park? What about the receipt?"
A. "Huh?"
Q. "What about the receipt?"
A. "He didn't give me a receipt."
Q. "So -- so, what -- what did he take with him? 35 bucks?"
A. "37."
Q. "OK. 37. Uh -- so -- uh -- all right then. Remember, Wil take out 50 for me and put in 15 of Joel's *cortiviri*. And I'm going to go (unintelligible) -- I'm going to go upstairs right now, as soon as -- (unintelligible)."
MS. GRAHAM: And let's end there. If you could now turn to Government Exhibit 600-20.
Q. What date was this call placed?
A. February 23, 2017.
Q. And what was the phone number being wiretapped?
A. 347-301-0144.
Q. And who are the participants on this call?
A. Gabriel, Wilson and an unidentified male.

MS. GRAHAM: And if we could turn to page 13, please. I'll begin reading five lines down as Gabriel.

Q. "And that (unintelligible) I'm going to have about -- about 50 something left over here."

A. "Oh, right. But you have around 50 here too, don't you? You have, like, 50 left over here?"

Q. "No. I -- no. I'm talking about the hard stuff."

A. "That's what I'm saying. You said something like 58 but of the soft stuff, to make it hard, if you want."

Q. "Right. Oh, man. (Laughs)."

A. "(Laughs)."

Q. "(Yawning noise)."

A. "(Laughs). Oh, all right. OK. So, let me get out of here so I can (unintelligible)."

Q. "They (unintelligible) did Joel lose again?"

A. "I don't know. No, because he only cooked it once."

Q. "Oh, right, right."

A. "Yeah. I was asking him yesterday, and he said to me, Listen for almost two days, I didn't -- that's what he said to me: I didn't work for almost two days and you think I'm going to let this go, leave this behind?"

Q. "(Laughs)."

MS. GRAHAM: Sorry. That's -- if you turn to the first page, that's a translator note. We won't read that.

MR. SCHOLAR: Judge, I would ask that they do read it,

Judge.

THE COURT: I can't hear you.

MR. SCHOLAR: I'm sorry. I would ask that they do read the translator's note, because it is contained in the transcript.

MS. GRAHAM: That's fine, your Honor.

THE COURT: OK.

MS. GRAHAM: That's fine, your Honor.

Q. If you could, read the translator note.

A. And the translator notes are where, you said?

Q. Sorry.

A. Oh, "(unclear from context)"?

Q. You can just read TN, which is translator note, and then read the text in that bracket?

A. "(Unclear from context)."

Q. "(Laughs)."

A. "(Unintelligible) or not."

Q. "(Laughs)."

A. "I'm going to keep this. That's exactly what he said to me yesterday."

Q. "But no, no -- but look -- but look at what a jerk Johnny is. He didn't bring anything, (N word). So now I have to --"

A. "(Unintelligible)."

Q. "-- listen, you tell him again --"

A. "(Unintelligible). No, no, but tell us, because that, that

way I think something's going to come in. He goes: Listen, we're not going to talk until it comes in. (Laughs)."

MS. GRAHAM: If we could turn to Government Exhibit 600-35.

Q. What date was this call placed?

A. March 1, 2017.

Q. And what was the wiretapped number?

A. The wiretapped number is 347-301-0144.

MS. GRAHAM: OK. And if we could turn to the next page, beginning three lines from the bottom. I'll begin as Gabriel.

Q. "3,015 and 1,000 -- 1,000. Wait, wait. OK. Joel hasn't done the one-one for me, right?"

A. "Let me wake up -- let me wake him up because he said that he was going to do it very, very early today."

Q. "No, no, no. (Unintelligible). (Background noises). (Unintelligible). It's going to do -- get, get your, get your part, Wilson. 1,015 there. Leave, leave Joel a thousand bucks right away."

A. "No, no. Are you crazy? Uh, I will give him mine --"

Q. "(Unintelligible)."

A. "-- and that's it."

Q. "(N word), are you crazy? (N word), get your 1,015 and leave 1,000 for him, and he will give -- I was going to give him 1,500 because I see that he is, like, there for us, but (N

word), he is still not earning it."
A. "(Chuckles). Tough."
Q. "Give it to him like that, exactly that. Leave that there for me. (F) it. Right there. (F) it. Now, with the (unintelligible), because I -- I never returned that thing, dude. You know it, (N word). He (unintelligible) --"

MS. GRAHAM: And let's stop there and turn to the next page, page 4, and I'll begin one line from the bottom.

Q. "(N word) that -- Wilson, but remind me (unintelligible). Give it to him just like that, dude, and if Joel says that he doesn't want it, hey, put it in his pocket. You put it on your back, give -- give half of it to Rita if you want and tell Joel to make the one-one for me at least, because today, uh, I know that I will sell a couple today."
A. "OK. And did you see -- and did you see the hard one, how it came out?"
Q. "It's that, (N word) --"
A. "Did you see it already?"
Q. "I am about to take -- I am about to take it back from Edward, (N word). (N word), one (unintelligible) you that thing at 100, at 112."
A. "I know. I know that's how it is."
Q. "(N word)."
A. "I know. I know that's how it is."
Q. "I was seeing it."

A. "I know what -- I know that's how it is."
Q. "But (unintelligible) --"
A. "What I will do is -- I know what I, I know what I am going to do for you, uh, so that you don't (unintelligible), I think that, I think that I know where -- the (unintelligible)."
MS. GRAHAM: Turning to the next page:
Q. "No, uh, it's that your way is the same as Joel's."
A. "Damn."
Q. "That is how you learned it. Every time you want to do it my way, you have always lost 20 and 15, (N word)."
A. "Dude, just so you know. Five --"
Q. "(Unintelligible)."
A. "-- at least."
Q. "No, and when I do it the way you guys do it, I don't (unintelligible), I don't, I don't lose, but it doesn't (unintelligible)."
A. No, no. It doesn't come out, like, exact, exactly now."
Q. "Hello."
A. "Yeah."
Q. "OK. OK. OK. OK. (Unintelligible)."
A. "Stay there, (unintelligible)."
Q. "It's heavy. It's heavy."
A. "I will tell him -- uh, I will tell him to wake up. He will do it."
Q. "No. That's fine. It's heavy. Yes, because that is one

minute, (N word). That is like -- while he heats up the water (unintelligible)."
A. "(Chuckles)."
Q. "And you have to go after him, telling him, Did you do it already?"
A. "OK. Oh, no. Joel is awake, yes. He must be on the computer (unintelligible). (Unintelligible) trying to fall asleep."
Q. "(Unintelligible). Oh, Wilson, what I have -- remember, (N word)."
MS. GRAHAM: And we'll stop there. Let's turn to Government Exhibit 602-21.
Q. What date was this call placed?
A. June 1, 2017.
Q. And what number was being wiretapped?
A. 347-701-0745.
Q. Who are the participants?
A. Gabriel, Wilson and an unidentified -- unidentified man 3.
MS. GRAHAM: So, turning to the next page, I'll read Gabriel, and if you could, at first, read unidentified male 3, and then we'll note when you switch to reading Wilson's part.
Q. "(Aside): To Joel. (Unintelligible). Six times (unintelligible). (Telephone rings). Joel. Over here. Um-um it's today."
A. "(Aside): Since this morning. That is what I am saying."

Q. "(Aside): (Unintelligible)."
A. "(Aside): I saw it."
Q. "(Aside): (Unintelligible)."
A. "(Aside): And they are different cars also. (N word) changing (unintelligible)."
Q. "(Aside): Today is the first. They are looking for (unintelligible) first."
A. "(Aside): To get it. Like, where you (unintelligible)?"
MS. GRAHAM: And if you could now switch to reading Wilson, please.
A. "Hey, (unintelligible) what?"
Q. "Hey, hey, hey."
A. "Hey, hey, hey, talk to me, man. What's (unintelligible)?"
Q. "Uh, no. I am calling Joel, but the thing is that I changed the number. So you can tell him. (Aside): Pass it, pass it. Don't stop next to it (unintelligible). Pass, pass, pass, pass. Hello. (Aside): Here, here."
A. I lost my --
Q. You were at --
A. I completely lost myself there.
Q. So, I had just read the first large text at the top of the page.
A. Wilson: "Hello."
Q. "Hello."
A. "Tell me. Tell me. What was that?"

Q. "What, what I was going to tell you was that, that, because the, the (unintelligible), not the Impala, but the small car that looks like an Impala, that small one.

MS. GRAHAM: And then UM3 says, "(Aside): Ford.

Gabriel says, "The Ford."

A. Uh-huh.

Q. "It has passed by six times, (N word), in less than, like, seven minutes. (Onomatopoeic sound)."

MS. GRAHAM: And Ms. Connolly.

(Audio played)

MS. GRAHAM: I just asked Ms. Connolly to play it from 54 seconds to 57 seconds of the call.

If you could just play that one more time, Ms. Connolly.

(Audio played)

MS. GRAHAM: Thank you.

And then the transcript continues after that sound.

Q. "Going in circles. I don't know if they were going to drop me, but no, no -- they kept going. And they went around again and around again. So you can call Joel so that he can stop, stop everything for a good while, (N word). They are going around on the block."

A. "Oh, OK."

Q. "The same, the same, same, same car, (N word). It passed by six times."

A. "Damn."
Q. "I (unintelligible) --"
A. "Oh, no, but (unintelligible) --"
Q. "(N word), I thought they were going to drop me. I said (F) it. You know what? I left that area. I was going to go up. Well, I didn't even go up."
A. "That's it. Fast."
Q. "That's it. But it is a (unintelligible) car. They are in the 'hood, because this morning, the guys, they called me, that they are, uh, they are, they are inside the hood."

MS. GRAHAM: And then unidentified male 3 says something unintelligible.

A. "OK."
Q. "OK, OK. Well, let me see, uh, (unintelligible)."
A. "Oh, I'm not by the house right now, no."
Q. "(Unintelligible)" --
A. "Well, I will call him."
Q. "No. I have been calling him for a while. The telephone is disconnected."
A. "Oh, OK."
Q. "That's tough."
A. "Oh, no. All right. (Unintelligible)."

MS. GRAHAM: If we could now turn to 600-01, this is the first call at the very beginning of the jury's binders.

Q. What date was this call placed on?

A. February 19, 2017.
Q. And what was the wiretapped phone number?
A. 347-301-0144.
Q. And the participants?
A. Gabriel, Wilson and another -- unidentified male 3.
Q. And if we could turn to the next page and if you could begin one, two, three, four, six up, with Wilson, where it begins, "Oh, I see."
A. "Oh, I see, (unintelligible). Here in the rat race. Hey, so, Joel (ph) asks if he can borrow between two and 300 bucks."
Q. "I really don't know (unintelligible). (Chuckles)."
A. "Uh, I see."
Q. "And, and (unintelligible)."
A. "No. I see. (Chuckles)."
Q. "No, no, but don't worry. (Unintelligible). Good, (unintelligible) now that it is fast. (Unintelligible) put it (unintelligible). Because let me tell you, uh, you -- you didn't do the -- you didn't do it Wilson, right?"
A. "Uh, I am doing it right now. I am doing it right now."
Q. "No, but -- no, but not -- but not everything yet, right?"
A. "No, no, no, no."
Q. "(Unintelligible). Hey, leave me 100, dude, (unintelligible). There isn't any anywhere, (N word). Believe me, I need -- I don't have any of the one-one."
A. "Oh, shit. Stop messing around."

Q. "Leave me the 100, uh, you already know that that is why I am telling you that there isn't any."
A. "(Laughs)."
Q. "(Laughs)."
A. "Dude, you got lucky, because look, I have -- everything is all set."
Q. "(Unintelligible)."

MS. GRAHAM: And if you could continue reading at the top of page 4, Agent Rodriguez.

A. "Everything, everything, everything."
Q. "-- I was going to call. I was going to call Joel today to give you 300 yesterday, but I didn't want to rush him so I doesn't think later that (unintelligible)."
A. "No. He has been telling me since before yesterday, but when you saw me, I was sleeping. I woke up, you know, it was all of a, all of a sudden. Then he mentions it to me at night (unintelligible). Oh, shit. Really? So -- and I didn't have this one. And now that I have this one, now, now I am talking to you. (Unintelligible), uh, this and that. (Chuckles)."
Q. "(Unintelligible). You haven't even done one round yet, right?"
A. "Uh, no, no. I am, in fact, what I am doing right now is -- (sniffs) I am weighing everything. So that --"
Q. "Uh."
A. "-- to make sure that everything is the way it should be."

Q. "Well, no, no. Well -- well, don't rush. What you make, just make 100, (unintelligible), and leave me the 200 without (unintelligible). When I get more (unintelligible), I will see you tomorrow. (Unintelligible)."

A. "(Chuckles). To make 100 for you and to give you the other 200? Dude, but here there are only two rounds of, like, 110 and 110. (Chuckles)."

MS. GRAHAM: And if we could now turn to page 11, and I will begin reading the last part of Gabriel on page 11.

Q. "I have four, four whole, and (unintelligible) -- I just sold and there, there isn't any. I -- I -- look, yesterday, dude, I was going to call you, but I said I won't call him. But what I -- I didn't want was, like, for him not to think, like, if (unintelligible) --"

A. "Dude, from before yesterday he's been telling me, Hey, tell him to bring me at least two to three bucks. Between 200 and 300."

Q. "(Unintelligible)."

A. "At least to pay for the light bill."

Q. "(N word), (unintelligible), (N word)."

A. "Uh, and, uh, but what? Imagine. When you saw that I was sleeping, I had gone to sleep at 11 in the morning, dude, and, you already know."

Q. "Damn. Uh, is he over there in the (unintelligible), or is he not there?"

A. "I don't think that he's, he is here right now, no. Let me see."

Q. "(Unintelligible). No, no. Just give me 100, dude. Hello, no. I know (unintelligible). I have at least 50 for Joel, because I have, like, 120 left, and I know that Edward asked me for, like, 100 back. That is my fear."

A. "It's tough."

Q. "(Unintelligible), Edward is asking me, There isn't any, (N word)?"

A. "Oh, I thought that he (unintelligible) money, that 100 and stuff. I see."

Q. "(N word), there isn't any, dude. I -- I am telling you that there isn't any."

A. "Oh, shit, dude. And what happened?"

Q. "(Unintelligible). (N word), that -- (chuckles). Give me (unintelligible), like if (unintelligible), put 100 aside for me, and I will go. I will go over there because (unintelligible) the grease, not yet. Because I am waiting to have a last little gram left. Listen, the stuff (unintelligible) I had to make up. Oh, dude. There isn't any for anybody."

A. "Is that right?"

Q. "There isn't any for anybody, (N word). I made eight and a half, dude, and it didn't last, not even one and a half days at most. (Unintelligible)."

MS. GRAHAM: And we'll end there and turn to the next call?

THE COURT: Ms. Graham, it's now 3:10.

MS. GRAHAM: Apologies. I had not been watching the clock.

THE COURT: Of course not, but it's my job to watch the clock.

MS. GRAHAM: Yes, your Honor.

THE COURT: OK. We will stop here for the day.

I remind you to please keep an open mind and not to discuss the case. Have a good evening.

MS. GRAHAM: Thank you.

THE COURT: Your notebooks you can leave right at your chairs. Thank you.

(Jury not present)

THE COURT: You're free to step down.

(Witness excused)

THE COURT: Do counsel wish to raise anything?

MS. ZVEROVICH: Nothing from the government, your Honor.

THE COURT: OK. See you tomorrow. Do you think we'll have anything to take up before 10:00?

MR. SCHOLAR: I don't think so.

THE COURT: So we can just say 10:00.

MS. ZVEROVICH: Thank you, your Honor.

THE COURT: See you then.

MS. GRAHAM: Thank you, your Honor.

(Adjourned to June 21, 2019, at 10:00 a.m.)

INDEX OF EXAMINATION

Examination of: Page

RAFAEL RIVERA

Direct By Ms. Zverovich . . . . . . . . . . . 291

Cross By Mr. Scholar . . . . . . . . . . . . . 330

Redirect By Ms. Zverovich . . . . . . . . . . 360

Recross By Mr. Scholar . . . . . . . . . . . . 367

RYAN STEWART

Direct By Ms. Zverovich . . . . . . . . . . . 369

Cross By Mr. Scholar . . . . . . . . . . . . . 380

Redirect By Ms. Zverovich . . . . . . . . . . 384

RAFAEL RODRIGUEZ

Direct By Ms. Graham . . . . . . . . . . . . . 385

GOVERNMENT EXHIBITS


| Exhibit No. | Received |
|---|---|
| 20C | 294 |
| 18B | 302 |
| 16 | 310 |
| 900 | 326 |
| 20 | 378 |