UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA

-against-

JOEL TAPIA,

Defendant.

-------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 20, 2020
```

17-CR-512 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

After a jury trial before this Court, Defendant Joel Tapia was convicted of conspiring to distribute five kilograms or more of cocaine, 100 grams or more of heroin, and an amount of cocaine base ("crack") less than 28 grams, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. Defendant now moves for a judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and for a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Because substantial evidence supported the jury's verdict, and because Defendant fails to prove that his trial counsel rendered ineffective assistance, both of Defendant's motions are DENIED.

## BACKGROUND

On May 14, 2019, a grand jury in this District returned a superseding indictment that charged Defendant in three counts. (ECF No. 407.) Count One charged Defendant with conspiring, from August 2016 through August 2017, to distribute and possess with intent to distribute more than one kilogram of heroin, more than five kilograms of cocaine, and more than 280 grams of crack, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. Count Two charged Defendant with possessing a firearm during and in relation to the drug trafficking crime charged

in Count One, and with aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2. Count Three charged Defendant with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

Defendant proceeded to trial before this Court, represented by Attorney Calvin H. Scholar. Mr. Scholar was appointed to represent Defendant pursuant to the Criminal Justice Act ("CJA"). *See* 18 U.S.C. § 3006A(a). After trial, the jury found Defendant guilty on Count One, for conspiring to distribute less than one kilogram but more than 100 grams of heroin, five kilograms or more of cocaine, and less than 28 grams of crack. The jury found Defendant not guilty on the firearms charges in Counts Two and Three. (ECF No. 481 at 956–57.)

On August 5, 2019, Defendant, through Mr. Scholar, filed a motion for a judgment of acquittal and a motion for a new trial. (ECF Nos. 495–96.) The Government filed an opposition brief on August 30, 2019. (ECF No. 513.) Defendant did not file a reply brief.

The Court commenced sentencing proceedings on February 18, 2020. During a colloquy about whether Defendant understood his Presentence Investigation Report, Defendant stated that he had difficulty communicating with Mr. Scholar about the facts and law underlying his pending post-trial motions. (ECF No. 595 at 3–14.) The Court appointed Katherine Goldstein as additional C.J.A. counsel to assist Defendant in amending his post-trial motions to include, among other things, an argument that Mr. Scholar had rendered ineffective assistance of counsel. (*Id.* at 10; ECF Nos. 592, 594.)

Through his new counsel, Defendant filed amended motions for a judgment of acquittal and for a new trial on April 17, 2020 (the "Amended Rule 29 Motion" and the "Amended Rule 33 Motion"). (ECF No. 607.) The Government filed an opposition brief on June 12, 2020. (ECF No. 633.) Defendant filed a reply brief on June 23, 2020. (ECF No. 637.)

## LEGAL STANDARD

Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29") allows a defendant to seek a judgment of acquittal if the evidence presented at trial was insufficient to sustain the jury's verdict of conviction.  A Rule 29 motion premised on the sufficiency of the evidence must be denied if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Thus, in evaluating a Rule 29 motion, the court "must credit every inference that could have been drawn in the government's favor, and affirm the conviction so long as, from the inferences reasonable drawn, the jury might fairly have concluded guilt beyond a reasonable doubt."  *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006) (citations omitted).  The jury's verdict must be upheld even if it is "based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation."  *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)).

Special deference is accorded to a jury's verdict on a conspiracy charge, for "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel."  *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)).  Nonetheless, a jury's conspiracy verdict cannot be upheld if the evidence establishes no more than the defendant's "presence at the scene of a crime, [or] the fact he knows that a crime is being committed," *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997), or the defendant's "mere association with those implicated in an unlawful undertaking," *United States v. Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008) (quotation marks omitted).

Rule 33 of the Federal Rules of Criminal Procedure ("Rule 33") allows a defendant to seek a new trial if the interests of justice so require.  "[M]otions for a new trial are disfavored in

this Circuit." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).  Therefore, a motion

for a new trial may be granted only if the court "find[s] that there is a real concern that an

innocent person may have been convicted."  *United States v. McCourty*, 562 F.3d 458, 475 (2d

Cir. 2009) (citation and internal quotation marks omitted).

**DISCUSSION**

**I.  The Amended Rule 29 Motion is Denied.**

Defendant makes two related arguments in his Amended Rule 29 Motion.  First, he

argues that the Government presented insufficient evidence to establish that he joined the

narcotics conspiracy charged in Count One.  Second, he argues that the Government presented

insufficient evidence to establish that, while a member of the conspiracy, he conspired to

distribute at least five kilograms of cocaine.  Neither argument has merit.

*a.  The Government's evidence was sufficient to establish that Defendant joined the charged narcotics conspiracy.*

At trial, the Government presented evidence sufficient to establish that Defendant was a

member of a drug trafficking organization that distributed heroin, cocaine, and crack in the Bronx

(the "DTO").  The evidence showed that Defendant received narcotics from Gabriel Guillen, one

of the DTO's leaders; helped the DTO to process and package narcotics; and distributed the

narcotics he received from Gabriel Guillen to other individuals.

First, the Government presented the testimony of Rafael Rivera ("Rivera"), a cooperating

witness and one of Defendant's co-conspirators, who testified about Defendant's involvement in

the DTO.  Rivera testified that, while he was working for the DTO, he learned that Gabriel

Guillen supplied Defendant with cocaine and heroin (Tr. 296); that Defendant processed the

heroin he received from Gabriel Guillen by adding "cut" (Tr. 306–07); that Defendant cooked the

cocaine he received from Gabriel Guillen into crack (Tr. 140–41, 203–04); and that Defendant distributed these drugs to various individuals (Tr. 211–12; 215–16; 234–35).  Rivera also testified that, on three occasions, he observed DTO members preparing cocaine and heroin for delivery to Defendant.  On each occasion, Rivera accompanied Gabriel Guillen to deliver the drugs to the "Cross Bronx Apartment," an apartment where Defendant lived with Wilson Guillen, another member of the DTO.  (Tr. 192–94, 215, 226–30.)  Rivera also testified that he observed Defendant cooking cocaine into crack with other members of the DTO at the Cross Bronx Apartment.  (Tr. 108, 197–203, 225.)

Defendant argues that no rational juror could have relied upon Rivera's testimony as proof of Defendant's membership in the DTO.  Defendant argues that Rivera's testimony was not credible because Rivera was a habitual liar who, according to his own testimony, lied to law enforcement on many occasions.  (Tr. 122, 127–30, 143, 338–41, 343–45, 347, 355.)  But it is not the Court's role, in adjudicating a Rule 29 motion, to second-guess the jury's credibility determination.  *See United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000).  The jury was entitled to believe Rivera's testimony about Defendant's role in the DTO even though Rivera testified that he lied on many occasions.[1]

Next, Defendant argues that Rivera's testimony was minimally probative because much of it concerned information that Rivera learned secondhand from Gabriel Guillen.  But Gabriel Guillen's statements about Defendant's role in the DTO were admissible as co-conspirator

---

[1] Defendant also implies that, by acquitting Defendant on the firearms charges, the jury found that Rivera was not a credible witness.  The Government sought to prove the firearms charges by eliciting Rivera's testimony that Defendant told Rivera that Defendant owned firearms.  (Tr. 109–10, 235–36, 316.)  The jury could have found Rivera's testimony credible, but concluded that Defendant was bluffing about owning a firearm.  Alternatively, the jury could have rejected Rivera's testimony about the firearms charges but credited some or all of his testimony about the narcotics charges.  *See United States v. Gleason*, 616 F.2d 2, 15 (2d Cir. 1979) (a jury may credit a witness's testimony "in whole or in part").

statements, and the jury was entitled to judge the credibility of Rivera's testimony for itself. *See* Fed. R. Evid. 801(d)(2)(E). Defendant points out that Rivera remained in the car when he and Gabriel Guillen delivered drugs to the Cross Bronx Apartment, so Rivera never actually saw Defendant receive the DTO's drugs. But the jury could have rationally inferred that Defendant did so, based on the circumstances Rivera described.

Next, Defendant challenges Rivera's testimony that he observed Defendant stirring a pot of crack cocaine and then moving the crack to a plate. (Tr. 200.) According to Defendant, this interaction was consistent with Defendant's desire to use the crack for personal use, rather than of his membership in the DTO. But the jury could have rationally have viewed this incident as evidence of Defendant's involvement with the DTO.

The Government also introduced the testimony of law enforcement officers who searched the Cross Bronx Apartment and Defendant's auto body shop, as well as the drugs and drug paraphernalia recovered during the searches. The Government showed that, when law enforcement officers searched Defendant's auto body shop, they recovered, *inter alia*, Ziploc plastic bags containing crack and heroin, and a scale with drug residue on it. (Tr. 546–56, 636–39.) When law enforcement officers searched the Cross Bronx Apartment on August 22, 2017, they recovered, *inter alia*, 292 grams of cocaine, 31 grams of crack, and a grinder with cocaine residue on it. (Tr. 484–515, 596–600, 627–29.) The Government also elicited the testimony of a forensic chemist who analyzed each sample and confirmed that it contained a contained a controlled substance. (Tr. 596–600, 627–39.)

Defendant argues that the drugs that were recovered from the Cross Bronx Apartment and his auto body shop could not have rationally been attributed to him. Defendant states that he moved out of the Cross-Bronx Apartment several months prior to the August 22, 2017 search (Tr. 212–13), and that his auto body shop was accessible to other individuals who could have

used the premises to store narcotics (Tr. 235).  These facts do not preclude the jury from having

rationally attributed the drugs recovered from the Cross Bronx Apartment and the auto body shop

to Defendant.[2]

The Government also introduced telephone calls, recorded by wiretap, in which the

Defendant discussed narcotics distribution with other members of the DTO.  In one recording,

Gabriel Guillen asked Defendant if he was "empty."  Defendant responded in the affirmative and

said that he had "five people waiting for me."  Gabriel Guillen asked if "50" is "too little right

now," and Defendant responded that "with 50 I can take care of one."  Gabriel Guillen confirmed

that he would bring the "50" to Defendant.  (GX 600-02-T.)  The jury could have rationally

understood Defendant's reference to "50" to refer to a quantity of drugs, and the "five people" to

be the DTO's customers.  Thus, this conversation would mean that Defendant arranged to receive

and sell the DTO's drugs.  In other recordings, Gabriel Guillen and Wilson Guillen discussed,

*inter alia*, the quantity of narcotics they would supply to Defendant (GX 600-05-T); Wilson

Guillen setting aside "ashes [i.e., cocaine]" that he received from Gabriel Guillen, to give to

Defendant (GX 600-48-T; Tr. 203); Defendant asking Wilson Guillen and Gabriel Guillen for

"one 'blanquin' [i.e., cocaine]" (GX 602-26-T; Tr. 258–59); and Defendant cooking crack (GX

600-20-T).  In another recording, Gabriel Guillen and one of his suppliers, Edward Jimenez,

discussed mixing unspecified narcotics with "[300] of Joel's cut."  (GX 600-03-T.)  In a phone

call recorded on June 1, 2017, Gabriel Guillen asked Wilson Guillen to tell Defendant to "stop

everything for a good while" to avoid detection by the police.  (GX 602-21-T.)  The jury could

likewise have rationally concluded that these phone calls were evidence of Defendant's

---

[2] In addition, Rivera testified that Defendant continued to engage in narcotics activities at the Cross Bronx
Apartment after he formally moved out, and the jury was entitled to credit this testimony.  (Tr. 224–26, 254.)

membership in the DTO.

Finally, the Government also introduced WhatsApp messages recovered from Defendant's phone.  In the WhatsApp messages, Defendant discusses, *inter alia*, cutting drugs with Benefiber (GX 502B-04 through 502B-19) and packaging "Maria [i.e., heroin]" (GX 502B-25-T through 502B-28-T; Tr. 257).  Defendant does not contest the probative value of this evidence.

Considering the probative value of all this evidence in the aggregate, the jury's finding that Defendant was a member of the DTO is supported by sufficient evidence.

> b. *The Government's evidence was sufficient to support the jury's findings as to drug quantity.*

The Government presented sufficient evidence at trial to support the jury's finding that Defendant conspired to distribute at least five kilograms of cocaine, 100 grams of heroin, and an amount of crack less than 28 grams.

Defendant challenges the jury's finding with respect to the quantity of cocaine that was attributable to the conspiracy.  Defendant does not challenge the jury's quantity findings with respect to heroin or crack, which were well-supported by the evidence.[3]

With respect to powder cocaine, the Government's evidence at trial was sufficient to support the jury's finding that Defendant conspired with the other members of the DTO to distribute at least five kilograms of cocaine.

The Government introduced testimony and wiretap recordings from which the jury could reasonably have inferred that Defendant was personally involved in transactions involving more

---

[3] With respect to heroin, Rivera testified that he observed DTO members preparing at least 100 grams of heroin for Defendant, and then accompanied Gabriel Guillen as Gabriel Guillen delivered the heroin to Defendant at the Cross Bronx Apartment.  (Tr. 192–94, 226–30.)  With respect to crack, Rivera testified that he observed Defendant cooking cocaine into crack in the Cross Bronx Apartment.  (Tr. 108, 197–201, 225.)

than five kilograms of cocaine.  Rivera testified that Gabriel Guillen told him that a minivan from

Chicago brought him, Gabriel Guillen, a delivery of five kilograms of cocaine in each of its tires,

and that the minivan was unloaded at "the shop."  (Tr. 136–37.)  The jury could have reasonably

inferred that these 20 kilograms of cocaine were delivered to Defendant at his auto body shop,

the only "shop" that was discussed at trial.  (Tr. 134.)  Rivera also testified that, on one occasion,

Defendant owed Gabriel Guillen $40,000 for a kilogram of cocaine and some heroin, and that,

while Defendant still owed this debt, Defendant purchased another kilogram of cocaine from an

unidentified third party.  (Tr. 163–64.)  Rivera's testimony about this transaction was

corroborated by a phone call recorded on June 2, 2017, in which Gabriel Guillen and Defendant

discussed Defendant's purchase of a kilogram of cocaine from Gabriel Guillen; and by a

subsequent phone call recorded on June 22, 2017, in which Gabriel Guillen told a DTO member

named Jerome about Defendant's decision to purchase a kilogram of cocaine from a third party

while he still owed Gabriel Guillen a debt.[4]  (GX 602-28-T; GX 602-52-T; *see also* GX 602-26-

T; GX 602-27-T).

In addition, the Government presented ledgers that belonged to Gabriel Guillen, which

provide independent evidence that Defendant personally received at least seven kilograms of

cocaine from Gabriel Guillen.  Although Gabriel Guillen did not testify about the contents of his

ledgers, other evidence allowed the jury to infer that his ledgers documented drug sales.  The

Government introduced Rivera's ledgers, and Rivera testified that he used these ledgers to

document drug sales because Gabriel Guillen instructed him to do so.  (Tr. 264.)  Rivera testified

---

[4] Defendant argues that this phone conversation was inadmissible evidence of Defendant's possible involvement in another narcotics conspiracy, under Rule 404(b) of the Federal Rules of Evidence.  But, the phone call was admissible to show that Gabriel Guillen had sold Defendant cocaine on a previous occasion; the Government never argued that Defendant's purchase of cocaine from another supplier was evidence that Defendant belonged to the charged DTO.

that he would sometimes denote sales of cocaine as "*suave*," and sales of crack as "*durin*." (Tr. 258, 268.) At other times, he would write down the quantity of drugs he sold to an individual in grams, the individual's name, the total price of the sale, and, occasionally, the amounts the individual paid on his or her debt. (Tr. 270.) Gabriel Guillen's ledgers employed these same words and accounting practices, and even documented sales to some of the same individuals as did Rivera's ledgers. Thus, the jury could rationally have inferred that Gabriel Guillen's ledgers, like Rivera's ledgers, documented sales of heroin, cocaine, and crack.

In the ledgers, Gabriel Guillen documented how much of each drug he supplied to the DTO's members and customers, including Defendant. Some ledger entries expressly list the type of drug supplied as "*suave*"—that is, cocaine. Other ledger entries simply listed a quantity and a price. Because the testimony at trial established that Gabriel Guillen sold cocaine for about $34 or $35 per gram, crack for $38 per gram, and heroin for about $53 per gram, the jury could have used the price information in the ledger entries to identify the drugs to which the ledger entries referred, even if the type of drug was not expressly listed in the entry.[5] (Tr. 148–49.) Considering ledger entries that either expressly list a sale of cocaine to Defendant or list the sale of an unspecified drug at a price close to the price at which Gabriel Guillen typically sold cocaine, the ledger entries reflect the sale of at least 7.18 kilograms of cocaine to Defendant. (*See* GX 403A at 4, 17, 24; GX 403D at 5; GX 403E at 3, 26; GX 403F at 22; GX 403G at 14; GX 403I at 3, 22, 36.)

Defendant argues that the ledger entries are "indecipherable," inconsistent, and unreliable.

---

[5] Rivera testified that Gabriel Guillen's prices varied based upon the customer, the quantity of the sale, and the price Gabriel Guillen paid for the drugs. (Tr. 148–49.) Rivera also testified that Gabriel Guillen sold narcotics to Defendant without making a profit. (Tr. 296.) In wiretapped phone calls, Gabriel Guillen discussed selling a kilogram of cocaine to Defendant for between $31,000 and $32,000. (GX 602-27-T, GX 602-52-T.) This evidence gave the jury additional information with which to identify the drug types referenced in ledger entries.

Defendant first points to a section of the ledger in which a line reading "200 Joel 6,900" appears directly below a line reading "85 Lente 5,000." (GX 403A.) Defendant argues that attempting to decipher these entries by drug price would yield a price of $34.50 per gram for Joel's cocaine, but a price of $58.82 per gram for Lente's cocaine, the latter of which would be far higher than the roughly $32–$38 for which cocaine was sold at this time. But the jury could rationally have concluded that, based on the prices for cocaine and for heroin, the entry marked "Joel" referred to cocaine, and the entry marked "Lente" referred to heroin, which sold for about $55 per gram. Defendant also points to an entry reading "$ Tommy 2,000" as evidence that the ledger is nonsensical, but the jury could rationally concluded that this seemingly incomplete entry does not undermine the probative value of the neighboring entries.[6] Likewise, the fact that the ledgers also reflect some legitimate expenses, such as gas and a U-Haul rental, does not mean that the jury could not have rationally concluded that other entries referred to drug sales.

Thus, considering Rivera's testimony, the wiretap evidence, the physical evidence recovered from the Cross Bronx Apartment and Defendant's auto body shop, and the ledgers, the jury's verdict as to the quantity of cocaine that was the subject of the conspiracy was supported with sufficient evidence.

## II. The Amended Rule 33 Motion is Denied.

Defendant claims that he is entitled to a new trial because his counsel, Mr. Scholar,

---

[6] In his reply brief, Defendant makes essentially the same argument about inconsistent pricing with respect to a ledger entry in which "Joel" is written above several entries: "200 soft 6900," "200 soft Pd 100," "225 soft," "200 soft red 2,000," "200 x 31.5 = 6,300." (GX 403E at 3.) According to Defendant, under the Government's theory, these entries show powder cocaine sales at nonsensically varied prices. Defendant focuses on the words "200 soft Pd 100," and argues that this entry shows that Defendant would have been charged $200 for 200 grams of cocaine. But, as the Government argued in summation, the "Pd 100" notation could mean that Defendant had paid off some of the debt he owed for the 200 grams of cocaine. Indeed, the presence of the word "soft" clearly identifies this entry as referring to cocaine. Thus, it would be rational for the jury to conclude that, although Gabriel Guillen's ledgers did not use an entirely consistent method of accounting, the listed entries refer to powder cocaine.

rendered ineffective assistance during trial.  A defendant may bring a Rule 33 motion after

conviction but prior to sentencing on the ground that his trial counsel rendered ineffective

assistance.  *United States v. Brown*, 623 F.3d 104, 113 n.5 (2d Cir. 2010).  In order to obtain a

new trial on the basis of counsel's ineffective assistance, a defendant must show that (1)

counsel's performance was objectively unreasonable, and (2) there is a reasonable probability

that, but for counsel's errors, the result of the trial would have been different.  *See Strickland v.*

*Washington*, 466 U.S. 668, 687–88, 694 (1984).  In evaluating the first prong of the *Strickland*

test, the court "must indulge a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance."  *Id.* at 689.  In evaluating the second prong, a

"reasonable probability" that counsel's errors were prejudicial is a "probability sufficient to

undermine confidence in the outcome."  *Id.* at 694.

Defendant claims that Mr. Scholar rendered ineffective assistance when he failed to

adequately (1) object during trial, (2) cross-examine witnesses, and (3) prepare for trial.

>    *a.  Mr. Scholar's Alleged Failure to Object.*

Defendant claims that Mr. Scholar should have objected to the admission of the drug

ledgers and to improper testimony by Rivera about Defendant's codefendants.  Defense counsel's

failure to object to inadmissible or prejudicial evidence can constitute ineffective assistance of

counsel.  *See Mason v. Scully*, 16 F.3d 38, 44 (2d Cir. 1994).

First, Defendant claims Mr. Scholar should have objected to the introduction of the drug

ledgers on the ground that their probative value was substantially outweighed by their risk of

causing unfair prejudice.  *See* Fed. R. Evid. 403.  Defendant argues that the ledgers documenting

Rivera's and Wilson Guillen's drug sales were of limited probative value because they scarcely

referenced Defendant, and they likely misled the jury into believing that Gabriel Guillen's

ledgers referred to drug sales.  But, as Mr. Scholar states in his affidavit, he strategically chose

not to object to the ledgers because they arguably referenced more than one person named "Joel." (Scholar Affidavit ¶¶ 41–43, ECF No. 633-1.)  This allowed Mr. Scholar to argue that references to "Joel" in other evidence did not refer to Defendant, without requiring Defendant to testify.[7]  (*Id.*)  In addition, Mr. Scholar argued that the ledgers were incoherent and not probative of Defendant's guilt.  (*Id.*)  This strategy was not unreasonable.  Even if it was unreasonable, Defendant cannot show prejudice.  The ledgers were highly probative of the conspiracy and Defendant's role in it; thus, an objection under Rule 403 would not have succeeded.

Next, Defendant claims Mr. Scholar should have objected when the Government elicited Rivera's testimony about engaging in various activities with his "codefendants," without specifying which codefendants he was referring to.  According to Defendant, Rivera's testimony may have misled the jury into believing that Defendant was closer to Rivera than he was, and that Defendant engaged in certain illegal acts that were actually done by his codefendants.  Defendant identifies only two occasions when Rivera used the word "codefendant" without clarifying precisely to whom he was referring.  In one instance, Rivera said that his "codefendants" showed him discovery evidence (Tr. 321); in the other, Rivera said that he smoked synthetic marijuana with his "codefendants" while in prison (Tr. 319–20).  These minor ambiguities in Rivera's testimony do not undermine the Court's confidence in the jury's verdict.  *Strickland*, 466 U.S. at 694.

> b.  *Mr. Scholar's Alleged Failure to Cross-Examine.*

Defendant argues that Mr. Scholar failed to adequately cross-examine two witnesses: Rivera and a detective who testified about his search of a DTO-affiliated apartment in Queens.

---

[7] At summation, Mr. Scholar argued, "Well, you can look at the notebooks yourselves. . . . One of the things they did show was that in addition to Joel, there's a Joelito. . . . there's a Jole, J-O-L-E. And then Matthew talks to somebody named Joe, J-O-E [in a wiretapped phone call]. So, who are these people on the ledgers?  Is it this Joel?  Jole, J-O-LE?  Joelito?" (Tr. 858–59.)

Defense counsel's failure to effectively cross-examine a witness can constitute ineffective assistance of counsel. *See Lindstadt v. Keane*, 239 F.3d 191, 204–05 (2d Cir. 2001).

First, Defendant argues that Mr. Scholar should have elicited statements from Rivera that would show that Rivera did not have a close relationship with Defendant. But Rivera testified on direct examination that he was not close with Defendant. (Tr. 163.) Mr. Scholar reiterated this point on cross-examination by asking Rivera, "You weren't close to Joel, correct?" (Tr. 348.) Thus, Mr. Scholar adequately cross-examined Rivera about his relationship with Defendant. Defendant also claims that Mr. Scholar failed to adequately ask Rivera about whether Rivera ever saw Defendant and his children leaving the Cross Bronx Apartment. This testimony would have furthered associated Defendant with the Cross Bronx Apartment, a center of DTO activity. It was reasonable for Mr. Scholar not to pursue this line of questioning.

Next, Defendant argues that Mr. Scholar should have cross-examined Detective José Sandobal, who testified that he searched an apartment in Queens where Gabriel Guillen lived. (Tr. 527–36.) Defendant argues that, because Detective Sandobal testified that he recovered drugs from that apartment, Mr. Scholar should have cross-examined him. The Government never argued that Defendant was responsible for the drugs or money recovered from the Queens apartment. No evidence, including Detective Sandobal's testimony, linked Defendant to this apartment, either. Therefore, it was not unreasonable for Mr. Scholar to choose not to cross-examine Detective Sandobal.

### c.  *Mr. Scholar's Alleged Failure to Prepare for Trial.*

Defendant claims Mr. Scholar failed to prepare for trial because he did not give his investigator, Nelson Lassalle, enough time to investigate the case, and because Mr. Scholar failed to communicate with Defendant about the evidence in his case. Defense counsel's failure to adequately investigate the facts of a case and prepare for trial can constitute ineffective assistance

14

of counsel.  *Lindstadt*, 239 F.3d at 204–05.

Defendant argues that Mr. Scholar's investigation of his case was insufficient because Mr. Scholar did not meet with the investigator, Mr. Lassalle, until just two weeks before trial. According to Defendant's affidavit, Mr. Lassalle told Defendant that he did not have enough time to gather information, and in fact failed to investigate certain aspects of his case.  (Tapia Affidavit ¶¶ 4–5, ECF No. 608-1.)  In an affidavit, Mr. Lassalle denies ever having told Defendant that he had insufficient time to investigate Defendant's case.  (Lassalle Affidavit ¶ 16, ECF No. 633-2.) Moreover, Mr. Lassalle describes the detailed steps he took to investigate Defendant's case, such as reviewing materials produced by the Government pursuant to 18 U.S.C. § 3500, reviewing relevant court documents, photographing the Cross Bronx Apartment, and obtaining additional evidence.  (*Id.* ¶¶ 6–22.)  The Court concludes that Mr. Scholar's use of Mr. Lassalle's services in preparation for Defendant's case was not unreasonable.  In any event, Defendant fails to show prejudice because he does not identify any facts that a lengthier investigation would have uncovered.

Defendant also states that Mr. Scholar failed to review the Government's evidence with him.  (Tapia Affidavit ¶ 3.)  According to Defendant, had Mr. Scholar done so, Defendant would have used his personal knowledge to identify flaws in the Government's case.  But Mr. Scholar states in his affidavit that he reviewed the discovery in Defendant's case with Defendant on no less than ten occasions.  (Scholar Affidavit ¶¶ 7–9.)  Mr. Scholar's testimony on this point is corroborated by Defendant's text messages to Mr. Scholar.  In one set of text messages, Mr. Scholar discusses bringing discovery evidence to Defendant; in another, Defendant states that the Government's lawyers "obviously haven't really looked at discovery."  (*Id.* Ex. 1 at 20, 27.)  In addition, Sarah Speis, Mr. Scholar's co-counsel, states that she and Mr. Scholar met with Defendant before and during trial to discuss various documents and videos relating to the

Government's case, including material produced pursuant to 18 U.S.C. § 3500.  (Speis Affidavit ¶¶ 4–10, ECF No. 633-3.)  Thus, the Court concludes that Mr. Scholar's review of the evidence with Defendant was not objectively unreasonable.

## CONCLUSION

For the reasons set forth above, Defendant's amended motions pursuant to Rule 29 and Rule 33 are DENIED.  (ECF No. 607.)  Defendant's initial motions pursuant to Rule 29 and Rule 33 are also DENIED.  (ECF No. 495.)

SO ORDERED.

Dated: New York, New York
       July 20, 2020                              _____/s/ Kimba M. Wood_____
                                                  KIMBA M. WOOD
                                                  United States District Judge